(No. 78101.—

*In re* PETITION OF OTAKAR KIRCHNER, Natural Father, for a Writ of *Habeas Corpus* Ordering John and Jane Doe, Custodians of His Son, Richard, to Deliver Richard to Him (Otakar Kirchner, Petitioner; John and Jane Doe *et al.*, Respondents).

*Announced January 25, 1995.—Opinion filed February 28, 1995.*

MILLER and McMORROW, JJ., dissenting.

Original action for writ of *habeas corpus*.

Loren L. Heinemann, of Orland Park, for petitioner.

Jerold S. Solovy, Laura A. Kaster, Cecelia M. Comito, Ruth A. Bahe-Jachna and Diane I. Bonina, of Jenner & Block, and Richard A. Lifshitz, of Mandel, Lipton & Stevenson, Ltd., all of Chicago, for respondents John Doe and Jane Doe.

Patrick T. Murphy, Lee Ann Lowder, Kass A. Plain and Mary Kenney, of the Office of the Cook County Public Guardian, of Chicago, for guardian *ad litem* Edward J. O'Connell.

Roland W. Burris, Attorney General, of Springfield, intervening on behalf of the State of Illinois.

PER CURIAM: Otakar Kirchner was granted leave to file with this court a complaint for writ of *habeas*

*corpus* on behalf of his son on November 15, 1994. The petition was premised upon this court's June 16, 1994, opinion invalidating the Does' adoption of Kirchner's son, herein identified as Richard. (*In re Petition of Doe* (1994), 159 Ill. 2d 347.) The petition requested that this court order the Does to surrender custody of Richard to Kirchner.

Oral arguments on the propriety of the writ and the Does' standing to seek a separate custody hearing were held on January 25, 1995. On that same day following oral arguments, this court concluded that, under the circumstances of this case, the Does did not have standing under the law to request a custody hearing in the trial court. Consequently, we ordered the writ of *habeas corpus* to issue immediately in order to bring this protracted litigation to an end and to prevent any further delay in the process of uniting father and son. Our opinion follows.

## HISTORY OF THE CASE

Otakar Kirchner (Otto) and Daniella Janikova, both Czechoslovakian immigrants, started dating in September of 1989 and began living together later that year. Seven months later, Daniella became pregnant. She and Otto continued living together and planned to get married. They obtained two marriage licenses towards this end, though they did not marry prior to the birth of their child, now commonly known as "Baby Richard." Shortly before Richard's birth, Otto returned to his native Czechoslovakia for two weeks to visit a dying relative. While he was away, a relative from Czechoslovakia telephoned Daniella and told her that Otto had resumed a relationship there with a former girlfriend. Distraught upon hearing this report, Daniella tore up their current marriage license, gathered her belongings and moved into a women's shelter because she had nowhere else to go.

While Daniella was living at the shelter, and before Otto returned from his trip abroad, Daniella's instructor at the beauty school she was attending encouraged her to put the baby up for adoption. This instructor phoned her lawyer, Ed Shapiro, who informed his employee, Mrs. Doe, that there was a baby available for adoption. The next day, the Does contacted Daniella about the adoption. The day after that, the Does had an attorney named Tom Panichi call Daniella and commence the adoption proceedings. Through Panichi, the private adoption of not-yet-born Richard was arranged between Daniella and the Does.

At all relevant times, both the Does' lawyer and the Does were fully aware that Daniella knew who the father was and that she intended to tell the father that the child had died at birth. Indeed, according to the testimony of the Does' lawyer, Panichi, Daniella told him that Otto would not consent to the adoption and asked him whether he knew how to fake a death certificate, to which he responded that he did not know how this could be done and that he could not be a party to obtaining a fake death certificate.

Rather than insist that Daniella disclose the name of the father so that he could be properly notified and his consent to the adoption procured, the Does and their attorney acquiesced in Daniella's scheme to tell Otto that his child had died at birth, even arranging for Daniella to give birth in a different hospital than she and Otto had originally planned. Indeed, attorney Panichi testified that he and the Does believed that "she was going to be able to control [Otto] from coming forward by still secreting the birth and the whereabouts [of the birth]."

Moreover, in his "Affidavit For Service By Publication," Panichi falsely stated that the father "upon due inquiry cannot be found so that process cannot be served

upon defendant." The Does continued this subterfuge in their adoption petition filed with the circuit court, which falsely alleged under oath that the father was "unknown." Curiously, the record is devoid of any effort by the Does' lawyer to contact Daniella's beauty school instructor or any of Daniella's friends or relatives in an attempt to obtain Otto's identity. Nor was any attempt made to learn Otto's name by checking out the address that Daniella and Otto had shared for over a year prior to Richard's birth and where Otto still lived. In short, no reasonable inquiry was made.

Unsuspecting, Otto returned to Chicago prior to Daniella's due date, whereupon he discovered that Daniella had left him. He learned through friends that she had gone to a women's shelter. He and Daniella then went through a period of reconciliation, during which time she did not inform him that she had arranged to place their child for adoption. When the birth took place on March 16, 1991, Otto's efforts to contact Daniella were rebuffed. He was told by Daniella's friends and relatives that his child had died at birth. We note that Otto and Daniella married in September of 1991.

In the weeks immediately following the birth, Otto, suspicious of the story that his child had died, attempted to discover the truth. In considering Otto's activities in the first 30 days after Richard's birth, the trial court found that Otto had called and visited the hospital in which he and Daniella had planned to have their baby, as well as other hospitals, but could not locate any record of his child being born. The trial court also found that Otto had rooted through the garbage cans outside Daniella's uncle's house where she was staying in an attempt to discover whether there were any diapers or other physical evidence which would indicate that his baby was alive.

On May 12, 1991, or 57 days after the birth of

Richard, Daniella confessed to Otto that she had given birth to a baby boy and had placed him in an adoptive home. At this juncture, Otto commenced his efforts to gain custody of his son. He retained a lawyer to help him. On June 6, 1991, Otto's lawyer entered an appearance on Otto's behalf in the subject adoption proceeding.

We note that at this point the adoption proceedings were rendered wholly defective. On June 6, 1991, the Does had both a legal and moral duty to surrender Richard to the custody of his father. Richard was then less than three months of age. Instead, the Does selfishly clung to the custody of Richard. They have prolonged these painful proceedings to the child's fourth birthday and have denied Otto any access to his own son.

After protracted procedural posturing on the part of the Does, a hearing was finally had on Otto's petition to defeat the adoption wherein it was established that neither had he been notified nor had he consented to the adoption as required under the Adoption Act. The Does subsequently petitioned the court to find that Otto's parental rights should be terminated because he was unfit, thus obviating the need for his consent.

After a hearing, the trial court found that Otto was unfit pursuant to section 1(D)(l) of the Adoption Act, which provides that an unwed father is unfit where it is found by clear and convincing evidence that he has "fail[ed] to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days after its birth." (750 ILCS 50/1(D)(l), 8(a)(1) (West 1992).) Though the trial court found that Otto, in an attempt to learn the truth about Richard, called various hospitals and had sorted through Daniella's garbage cans in his search for evidence, all in the first 30 days after Richard's birth, the trial court did

not deem this sufficient to show interest under section 8(a)(1). Rather, the court concluded, in essence, that Otto's efforts were insufficient because he did not contact a lawyer in that 30-day period. It was on this untenable basis that the trial court ruled that Otto was unfit.

Otto filed a notice of appeal. Fifteen months later, the appellate court, per Justice Rizzi, affirmed the trial court in a divided opinion (*In re Petition of Doe* (1993), 254 Ill. App. 3d 405 (Tully, P.J., dissenting)). By the time the appellate opinion was filed, Richard was $2^1/2$ years of age.

In erroneously affirming the trial court, the appellate court's majority opinion concentrated its discussion on the best-interests-of-the-child standard, addressing only secondarily the sole issue on appeal, namely, whether the trial court's ruling that Otto was unfit was against the manifest weight of the evidence. Having lost at the appellate level, Otto then appealed to this court, which, in a unanimous decision on June 16, 1994, reversed the trial and appellate courts and vacated the adoption, holding that Otto was fit under section 8(a)(1) of the Adoption Act and, thus, that his parental rights had never been properly terminated. *In re Petition of Doe*, 159 Ill. 2d 347.

In vacating the adoption, this court noted that a child is not available for adoption until it has been validly determined that the rights of his parents have been properly terminated. As this court held in *In re Adoption of Syck* (1990), 138 Ill. 2d 255, 276-78, when ruling on parental unfitness, a court cannot consider the child's best interests, since the child's welfare is not relevant in judging the fitness of the natural parent. Only after the parent has been found by clear and convincing evidence to be unfit can the court proceed to consider the child's best interests and whether those interests would be served if the child were adopted by

the petitioners. Though we note that the best-interests-of-the-child standard is not to be denigrated, we reiterate that this standard is never triggered until after it has been validly determined that a child is available for adoption.

Under Illinois law, parents may be divested of parental rights either through their voluntary consent or involuntarily due to a finding of abuse, abandonment, neglect or unfitness by clear and convincing evidence. (See 750 ILCS 50/8, 11 (West 1992).) The adoption laws of Illinois are neither complex nor difficult of application. These laws intentionally place the burden of proof on the adoptive parents. In addition, Illinois law requires a good-faith effort to notify the natural father of the adoption proceedings. (750 ILCS 50/7 (West 1992).) We call this due process of law. In the case at hand, the Does and their lawyer knew that a real father existed whose name the birth mother knew. They also knew that the father, if contacted, would not consent to the adoption. This may explain their lack of effort to learn the name of the father and to give him notice. Under these circumstances, the Does proceeded with Richard's adoption at their peril.

This court then observed that Otto, as the natural father of Richard, was statutorily entitled to receive notice of the adoption and statutorily required to consent in order for the adoption to be valid, absent a finding of unfitness. Examining the unfitness finding of the trial court, we concluded that the trial court's finding was against the manifest weight of the evidence. As the trial court found, Otto searched the garbage cans of the home where Daniella was living for physical evidence of his baby and called a series of hospitals in an attempt to discover whether his child had really died at birth, during the first 30 days after Richard was born notwithstanding that he had been told his child was dead.

Through lies, deceit and subterfuge, Otto was denied any opportunity to establish any involvement with his child during the first 57 days of his life. His activities, however, showed an intense interest and concern for both the truth and for his child. He did what he could. Thus, the trial court's ruling that Otto had failed to show a sufficient interest in his child within the first 30 days after the child's birth was against the manifest weight of the evidence.

After this court's unanimous vacation of the adoption and our denial of the Does' petition for rehearing, we stayed the mandate at the Does' request pending their application for a writ of *certiorari* to the United States Supreme Court. The mandate of this court vacating the adoption issued on November 9, 1994, after the United States Supreme Court's denial of *certiorari* on November 7, 1994.

The Does, however, did not return Richard to Otto upon the issuance of this court's mandate. Subsequent to this court's opinion vacating the adoption, the General Assembly enacted an amendment to the Adoption Act which specified that it was to take effect immediately and apply to all cases pending at the time of the effective date, which was July 3, 1994. This new legislation, enacted at the urging of Governor Edgar, requires that upon the vacation of an adoption proceeding a custody hearing take place in order to determine who should have custody of the child based upon the child's best interests.

Armed with this new amendment to the Adoption Act, as well as their interpretation of section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/601(b)(2) (West 1992)), the Does then petitioned for a custody hearing in the circuit court of Cook County. Richard's guardian *ad litem* joined that suit on Richard's behalf.

At this juncture, Otto filed the instant petition for writ of *habeas corpus* with our court, in essence arguing that upon the vacatur of Richard's adoption, he was legally vested with Richard's custody and that the Does and Richard's guardian *ad litem* were without standing to seek custody under either the Marriage and Dissolution of Marriage Act or the amendments to the Adoption Act. Insofar as Otto challenged the constitutionality of the Adoption Act, the Illinois Attorney General requested and was granted leave to intervene in support of the constitutionality of the amendment.

Oral arguments on the propriety of the writ of *habeas corpus* were held on January 25, 1995. On the same day and following oral arguments, this court concluded that the Does did not legally have standing to request a custody hearing. Consequently, we ordered the writ of *habeas corpus* to issue immediately, with the opinion to follow, in order to bring this protracted litigation to a speedy and final conclusion.

## JURISDICTION TO ENTERTAIN THE *HABEAS CORPUS* PETITION

Initially, it must be determined whether Otto has standing to act on behalf of his son to file the instant *habeas corpus* petition. Contrary to the suggestion of the public guardian, the court-ordered appointment of a guardian *ad litem* does not divest Otto of his right to act on his son's behalf in filing a *habeas* petition. (See *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201; *Cormack v. Marshall* (1904), 211 Ill. 519.) Indeed, insofar as this court held in its June 16, 1994, opinion that Otto expressed sufficient interest in his son such that his parental rights had not legally been terminated, no one, not even Richard's guardian *ad litem*, stands in a better position than Otto to represent the interests of his son.

It must likewise be decided whether a writ of *habeas corpus* is appropriate in cases where the would-be adop-

tive parents attempt to retain custody of a child notwithstanding the invalidation of the adoption by the courts. This court has jurisdiction to entertain writs of *habeas corpus*, generally, pursuant to article VI, section 4(a), of the Illinois Constitution of 1970 (Ill. Const. 1970, art. VI, § 4(a)), as well as Supreme Court Rule 381(a) (134 Ill. 2d R. 381(a)). Moreover, historically, the writ was employed in instances where the custody of a child was at issue and the petitioner had no other legal avenue by which to seek custody of the child. See *Edwards*, 42 Ill. 2d 201; *Cormack*, 211 Ill. 519.

The Does argue that Otto should not be allowed to seek the writ because the vacation of the adoption does not require that custody revert to Otto and, further, that section 601(b) of the Marriage and Dissolution of Marriage Act, as well as the amendments to the Adoption Act (Pub. Act 88—550, eff. July 3, 1994 (adding 750 ILCS 50/20(b))) which became effective while the Does' petition for rehearing was pending in this court, take precedence over these proceedings. We disagree. For the reasons expressed later in this opinion, we find that neither the Marriage and Dissolution of Marriage Act nor the recent Adoption Act amendments apply to the instant case. As a consequence, Otto has properly filed the instant writ of *habeas corpus* which this court has jurisdiction to grant pursuant to article VI, section 4(a), of the Illinois Constitution of 1970, as well as Supreme Court Rule 381(a).

The Does further argue, as does the public guardian, that Otto's *habeas* petition is improper because Richard is not being restrained in his liberty against his will. In support, they note that he is in the custody of the persons who have raised him since birth and, further, that his guardian *ad litem*, whose purpose is to safeguard Richard's interests, does not object to the Does' continued custody of Richard. However, the self-serving nature

of this argument is readily apparent. As we have observed above, Otto, as Richard's natural father whose rights have not been terminated, has equal if not greater standing to assert what is in his son's best interests. To the extent that he disagrees with Richard's guardian *ad litem*, not to mention Richard's current custodians, Otto speaks for Richard and is entitled to file a writ of *habeas corpus* on Richard's behalf.

Finally, noting that under Supreme Court Rule 381(a) this court does not have jurisdiction to entertain *habeas* petitions where factual questions must be decided, the Does argue that this court does not have jurisdiction because granting the instant *habeas* petition requires us to weigh facts to determine where Richard's best interests lie in awarding custody. In support, the Does cite *Sullivan v. People ex rel. Heeney* (1906), 224 Ill. 468, 477, for the proposition that upon the vacation of an adoption there must be a best-interests hearing to determine who should have custody of the improperly adopted child. The Does, however, grossly misread *Sullivan* on this point.

In *Sullivan*, this court vacated the adoption because the married father did not have notice of the adoption of his daughter. (*Sullivan*, 224 Ill. at 472.) However, because there was evidence that the father had abandoned his wife and child for six years prior to the adoption, the court remanded the case to the trial court to determine whether the father was unfit. (*Sullivan*, 224 Ill. at 477.) In so doing, the court noted that the best interests of the child might require that her father not be vested with her custody upon the vacation of the adoption. *Sullivan*, 224 Ill. at 477.

In claiming that *Sullivan* likewise requires a best-interests hearing in the instant case, the Does take the best-interests language of *Sullivan* out of context. *Sullivan* explicitly stated that upon the vacation of an adop-

tion, custody of the child cannot remain with the would-be adoptive parent absent a finding that the natural parent is unfit. (*Sullivan*, 224 Ill. at 476.) Though the *Sullivan* court spoke in terms of the best interests of the child and remanded the matter to the trial court for further proceedings, the proceeding ordered was not a best-interests hearing but, rather, a fitness hearing. Indeed, the *Sullivan* court emphatically stated that the child's father's rights were "superior to the right of any other person" in the event that he were subsequently adjudicated fit in the remanded proceedings. (*Sullivan*, 224 Ill. at 476-77.) Because we have already ruled that Otto was "fit" as defined by the Adoption Act, Otto's rights are similarly "superior to the right of any other person" and a best-interests hearing would thus be improper.

The Does also cite *Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556, for the proposition that Otto must participate in a best-interests hearing and, thus, that a father can be divested of his right to the care, custody and control of his child without a finding of unfitness upon the vacation of an adoption where doing so is in the child's best interests. The *Giacopelli* mother and father were married and conceived a child when the mother was 44 years old. (*Giacopelli*, 16 Ill. 2d at 558.) The mother travelled from Missouri, where she and her husband lived, to visit a relative in Illinois. (*Giacopelli*, 16 Ill. 2d at 558.) While in Peoria, Illinois, she contacted the Florence Crittenton Home for unwed mothers and arranged to place the baby with an adoptive family. Upon the child's birth, the circuit court entered a finding of dependency and appointed a guardian, who subsequently placed the child with a family that intended to adopt the child. (*Giacopelli*, 16 Ill. 2d at 560-61.) When the father found out about this several

months later, he successfully had the finding of dependency vacated for lack of notice and then sought the return of his child. (*Giacopelli*, 16 Ill. 2d at 562.) When the adoptive parents refused, the father filed a *habeas* petition seeking an order that his child be delivered to his care, custody and control.

Upon consideration of the advantages of the home in which the child had been placed, the trial court found that it would be in the child's best interests if she were not returned to her father. (*Giacopelli*, 16 Ill. 2d at 563.) The appellate court reversed, noting that there had been no finding of unfitness and that a married father cannot be denied the care, custody and control of his child without first finding him unfit. (*Giacopelli*, 16 Ill. 2d at 563.) This court, however, reversed the appellate court and held that a married father could be denied his rights to the care, custody and control of his child without a finding of unfitness if this is in the child's best interests.

Initially, we note that the holding of *Giacopelli* is clearly unconstitutional. Married parents cannot be deprived of the care, custody and control of their child without a prior showing of unfitness for the sole reason that doing so is thought to be in the child's best interests. (*Quilloin v. Walcott* (1978), 434 U.S. 246, 255, 54 L. Ed. 2d 511, 520, 98 S. Ct. 549, 555, citing *Smith v. Organization of Foster Families for Equality & Reform* (1977), 431 U.S. 816, 862-63, 53 L. Ed. 2d 14, 46, 97 S. Ct. 2094, 2119 (Stewart, J., concurring in the judgment, joined by Burger, C.J., and Rehnquist, J.).) Rather, unfitness must first be found. (*Quilloin*, 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549.) Thus, because *Giacopelli* dispenses with the need to find unfitness, it stands as an unconstitutional remnant of a bygone era and has no precedential value. The Does' contention that *Giacopelli* somehow requires that Otto be subjected to a best-

interests hearing without first being found unfit is therefore meritless.[1]

<hr>

[1]Parenthetically, we note that even if *Giacopelli* could survive constitutional scrutiny, it was improperly decided. Along with *Sullivan*, *Giacopelli* cites five cases in support of its holding that the best-interests-of-the-child standard controls the outcome of a custody hearing notwithstanding that the natural parents have not been found unfit. (*Stalder v. Stone* (1952), 412 Ill. 488; *People ex rel. Noonan v. Wingate* (1941), 376 Ill. 244; *Mahon v. People ex rel. Robertson* (1905), 218 Ill. 171; *Cormack v. Marshall* (1904), 211 Ill. 519; *In re Petition of Smith* (1851), 13 Ill. 139.) None of these cases, however, stand for this proposition. *Smith*, *Robertson* and *Wingate* involved custody disputes between nonparents. *Cormack*, 211 Ill. at 527, implicitly required an unfitness finding as a prerequisite to divesting a natural parent of custody where it states that the parental-preference doctrine controls absent "glaring defects and such disregard of morals." (See also *Cormack*, 211 Ill. at 523-24.) Finally, *Stalder* denied the natural mother custody of her child only upon the court's finding that she was unfit due to desertion and depravity, and only then stated that "under this evidence" the superior right of the parent must yield to the best interests of the child. (*Stalder*, 412 Ill. at 497-98.) Clearly, none of these cases support the *Giacopelli* court's assertion that a child can be taken away from a married father (or an unwed father for that matter) without a finding of unfitness.

Recognizing that the *Giacopelli* majority's pronouncement departed from all precedent, Justice Klingbiel's concurrence, joined by Justices Schaefer and House, made it clear that a finding of unfitness was a prerequisite to taking children away from their parents and that the bare assertion that doing so is in a child's best interests is insufficient to justify taking children away from their parents without a finding of unfitness. Turning to the majority opinion, the concurring justices noted that beyond making the assertion that the best interests of the child control regardless of unfitness, the majority found in favor of the adoptive parents because the father was clearly unfit. (*Giacopelli*, 16 Ill. 2d at 562, 566-67 (father had 26 arrests, numerous convictions, several convictions for bigamy, and a lack of interest in his wife and child prior to and after the birth of the child).) Only because the concurring justices likewise found that the father

Moreover, the reasoning in *Giacopelli* does not comport with this court's more recent pronouncements regarding custody law and the difference between custody proceedings and adoption proceedings. In *In re Custody of Townsend* (1981), 86 Ill. 2d 502, 508-09, this court held:

"The superior-right doctrine or presumption in favor of the natural parent, however, need not always be applied automatically in conjunction with the best-interests[-]of-the-child standard. For example, in a dissolution-of-marriage proceeding, the superior-right doctrine will not be applied where both the natural parents are seeking custody of their children. Instead each starts out on equal footing, with the court ultimately determining custody 'in accordance with the best interest of the child' [citation]. Under the Adoption Act [citation], on the other hand, both the superior-right doctrine [citation] and the best-interests standard are applied [citation], *though in this setting, a court, before permitting adoption by a third party, may not terminate all parental rights, including custody, unless the parent or parents consent or are found to be 'unfit.'* " (Emphasis added.)

From *Townsend* it follows that, to the extent *Giacopelli* allows the termination of parental rights in adoption proceedings without a finding of unfitness, it is not the law of Illinois. See *Robinson v. Neubauer* (1967), 79 Ill. App. 2d 362, 366-67 (following the concurrence in *Giacopelli* and not the majority).

Although *Townsend* cites to *Giacopelli* and further finds that the father at issue need not be found unfit to award custody of his child to a third party, it does so pursuant to the Probate Act of 1975, which is only triggered upon the death of a parent, a situation we are not confronted with in the instant case. Unlike the Adoption Act, the Probate Act does not statutorily mandate a finding of unfitness as a condition precedent to divesting

was unfit did they concur in the judgment of the court, though not in its reasoning.

a parent of custody. (See 755 ILCS 5/11—7 (West 1992); see also *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201 (a probate case deciding custody based upon the best interests of the child without a prior finding of unfitness).) The best-interests standard employed pursuant to the Probate Act in *Townsend* and *Edwards* is thus inapplicable to the case at bar both because this case does not involve a deceased parent and because Otto's cause of action arises out of the Adoption Act, which mandates a finding of unfitness before parental rights may be terminated. Moreover, we note the extremely adverse public policy ramifications of holding that parents and their offspring can be deprived of the care, custody and control of the natural parent through the deceitful circumvention of the safeguards afforded natural parents in the Adoption Act: namely, the right to notice and the absolute right to veto the adoption absent a finding of unfitness.

The sole issue, then, in the instant *habeas* proceeding is the legal question of the Does' asserted standing to request a custody hearing under either section 601(b)(2) of the Marriage and Dissolution of Marriage Act (750 ILCS 5/601(b)(2) (West 1992)) or the amendment to the Adoption Act (Pub. Act 88—550, eff. July 3, 1994). Because we find, as a matter of law, that neither of these statutes applies in the instant case, there are no further factual issues to be determined. Thus, the issuance of the writ of *habeas corpus* by this court is a proper and just procedure.

### STANDING UNDER SECTION 601(b)(2) OF THE ILLINOIS MARRIAGE AND DISSOLUTION OF MARRIAGE ACT

Our decision of June 16, 1994, unanimously held that Otto had exhibited sufficient interest in his child during the first 30 days of his life and that the trial court had thus erred in finding him unfit pursuant to

section 8(a)(1) of the Adoption Act. Insofar as this court denied the petition for rehearing in this case on July 12, 1994, the doctrine of *res judicata* precludes reconsideration of these conclusions in determining the appropriate outcome in the instant *habeas corpus* proceeding. Rather, what must be determined is the effect of this court's vacation of the Does' invalid adoption of Richard.

The Does assert that they have standing under section 601(b)(2) of the Marriage and Dissolution of Marriage Act to seek a custody hearing to determine who should have custody of Otto's son now that the adoption has been vacated. We disagree.

Initially, the Does argue that Otto has waived the right to object to their lack of standing to request a hearing under section 601(b)(2) because of his failure to make a timely objection to their lack of standing. The Does point out that Otto never filed an affirmative defense of lack of standing in his response to the Does' section 601(b)(2) motion filed with the circuit court of Cook County on December 23, 1991, but, rather, raised it for the first time in the instant *habeas* proceedings, over three years later. This argument, however, is meritless. The Does' section 601(b)(2) petition of 1991 was filed together with their amended petition to adopt Richard. When the circuit court erroneously approved the adoption in May of 1992, thus terminating Otto's parental rights, the Does' section 601(b)(2) petition for a custody hearing was rendered a nullity insofar as they had been awarded custody of Richard under the Adoption Act. Indeed, the Does' filing of a second section 601(b)(2) petition in November of 1994 evidences that even they do not take seriously their contention that their 1991 petition is still pending.

Though our decision is based solely on Illinois law, in determining what role section 601(b)(2) of the Marriage and Dissolution of Marriage Act plays in the

instant case we commence with a review of the rights afforded unwed fathers by our Federal Constitution. At stake here is the interest that a natural parent has in the care, custody and control of his or her child, an interest that has long been recognized and afforded constitutional protection. In a series of cases considering the rights of unwed fathers vis-a-vis their offspring, the United States Supreme Court has indicated that while biology alone is insufficient to vest an unwed father with the same rights as the child's mother, if the unwed father grasps the opportunity that this biological link provides, accepts responsibility for the child, and develops a relationship with the child, the father enjoys the same constitutional due process rights afforded married fathers and birth mothers. (*Michael H. v. Gerald D.* (1989), 491 U.S. 110, 105 L. Ed. 2d 91, 109 S. Ct. 2333; *Lehr v. Robertson* (1983), 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985; *Caban v. Mohammed* (1979), 441 U.S. 380, 60 L. Ed. 2d 297, 99 S. Ct. 1760; *Quilloin v. Walcott* (1978), 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549; *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208.) Of course, where an unwed father fails to grasp this opportunity, the father is not vested with these due process rights.

None of these United States Supreme Court decisions, however, discuss an unwed father's rights regarding an infant placed for adoption at birth who seeks to raise his child but is prevented from doing so through deception. We find that the rationale underlying the Court's opinions dealing with the rights of unwed fathers thus far suggests that fathers such as Otto, whose parental rights are not properly terminated and who, through deceit, are kept from assuming responsibility for and developing a relationship with their children, are entitled to the same due process rights as fathers who actually are given an opportunity and do

develop this relationship. To hold otherwise would be to encourage and reward deceit similar to that which occurred in the instant case.

Moreover, without regard to Federal constitutional jurisprudence, Illinois law requires that Otto be granted the care, custody and control of his son. The Adoption Act (750 ILCS 50/1 *et seq.* (West 1992)) creates a framework which acknowledges the due process rights of unwed fathers and balances their rights to the care, custody and control of their children with the need to facilitate orderly and final adoptions which are not subject to collateral attack. Toward this end, the Adoption Act provides that where the birth mother is not married to the father, his consent to the adoption is essential except where he has been found unfit by clear and convincing evidence. (750 ILCS 50/8(a)(1) (West 1992).) Among the statutory factors for finding unfitness, and the one asserted to be applicable to the instant case, is the provision finding unfitness where the father fails to "demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days after its birth." 750 ILCS 50/1(D)(l), 8(a)(1) (West 1992).

Under the Adoption Act effective at the time this court invalidated the Does' adoption of Richard, an unwed father who was both fit and willing to take on the responsibility of raising his child had a right superior to all others except the birth mother to the care, custody and control of his child. Moreover, such a fit and willing father had the absolute right to block the adoption of his child, notwithstanding the birth mother's desire to place the child with an adoptive family. (See 750 ILCS 50/8(a)(1) (West 1992) (requiring that "consents shall be required in all cases, unless the person whose consent would otherwise be required shall be found by the court, by clear and convincing evidence *** to be an

unfit person as defined in Section 1 of this Act").) In this manner, the statute safeguards the rights of unwed fathers who come forward and are willing and fit to raise their children.

The Adoption Act does not explicitly address the rights of all the parties to a failed adoption. However, the procedural safeguards afforded fathers by the Adoption Act militate that fathers be placed in the same legal position after the vacation of an invalid adoption as they were in prior to the invalid adoption's approval. As already discussed, the Adoption Act requires that an unwed father either consent to the adoption of his child or be found unfit by clear and convincing evidence before a valid adoption can take place.

Now that the invalid adoption of Richard has been vacated, the Does seek to use the Marriage and Dissolution of Marriage Act to obtain a custody hearing. However, it follows from the Adoption Act that the Does cannot, once an invalid adoption is vacated, attempt to circumvent the rights afforded fathers under the Adoption Act by seeking a custody hearing under the Marriage and Dissolution of Marriage Act, which, unlike the Adoption Act, could result in a father's being divested of his right to the care, custody and control of his child without being found unfit by clear and convincing evidence.

This construction is wholly consistent with the purpose of the Adoption Act, which balances the age-old parental-preference doctrine that a child is better off being raised by his or her natural parent(s) with the need to facilitate legal adoptions. Thus, we hold that where an unwed father is fit and willing to develop a relationship with and raise his child, but is prevented from doing so through deceit and an invalid adoption proceeding, that father is entitled to the care, custody and control of his child upon the subsequent vacatur of the

invalid adoption. Under these facts, we hold that a section 601(b)(2) hearing under the Marriage and Dissolution of Marriage Act would be improper because it would contravene the safeguards afforded unwed fathers in the Adoption Act.

Moreover, we note that the Does' dependence on section 601(b)(2), even if it did not improperly attempt to circumvent the procedural safeguards of the Adoption Act, is otherwise misplaced. Our conclusion that the Does are not entitled to a section 601(b)(2) custody hearing depends not only upon our determination that the vacation of an adoption puts all the parties in the same position that they were in prior to the vacatur of the adoption, but also upon a thoughtful reading and analysis of section 601(b)(2) itself.

The superior right of the natural parents to the care, custody and control of their child is the law of the land and is also embodied in Illinois statutory law. (See *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 51; *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394, 397-98; *In re Custody of Barokas* (1982), 109 Ill. App. 3d 536, 543.) Unless a parent consents or is adjudged unfit, a child may not be placed in the custody of a nonparent. (*Peterson*, 112 Ill. 2d 48.) Given that section 601(b)(2) of the Marriage and Dissolution of Marriage Act allows for custody to be vested in a nonparent without first finding unfitness, its application must be narrowly construed to ensure the sanctity of the family and the reciprocal familial rights of parents and their children. *Peterson*, 112 Ill. 2d at 54.

Section 601 reads in pertinent part:

"(b) A child custody proceeding is commenced in the court:

\* \* \*

(2) by a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but only if he is not in the

physical custody of one of his parents." (750 ILCS
5/601(b)(2) (West 1992).)

At first glance, the terms of this provision might suggest
that the Does have standing to seek a custody hearing
regarding Richard because Richard is not in the physi-
cal possession of Otto. This interpretation, however, is
flawed.

Before a nonparent can demand a custody hearing
to determine the best interests of a child under section
601(b)(2) of the Marriage and Dissolution of Marriage
Act, the nonparent must first show that he or she has
standing to invoke this extraordinary provision. (*Peter-
son*, 112 Ill. 2d at 53.) It is this standing requirement
that ensures that the superior right of natural parents
to the care and custody of their children is safeguarded.
A nonparent may only assert standing under section
601(b)(2) if the natural parent at issue does not have
physical custody of his or her child.

But physical possession is not the same as physical
custody, and it is the difference between these two
concepts that defeats the Does' standing argument under
section 601(b)(2). The determination that a parent
does not have physical custody of a child turns not on
possession; rather, it requires that that parent somehow
has voluntarily and indefinitely relinquished custody of
the child. (See *In re Custody of Kulawiak* (1993), 256 Ill.
App. 3d 956, 962; *In re Marriage of Sechrest* (1990), 202
Ill. App. 3d 865, 873.) Whether the relinquishment
results from a calculated decision on the parent's part
or is the product of abandonment, the relinquishment
must be voluntary for section 601(b)(2) to apply. *Sechrest*,
202 Ill. App. 3d at 873.

In reading any statute, its words must be given a
commonsense meaning. The Does would have us lift the
word "custody" from this statute and conclude that it is
synonymous with "possession." That cannot be. The
father and natural guardian, Otto, neither voluntarily

placed Richard with the Does nor has he consented to their continued possession. For purposes of section 601(b)(2), therefore, the Does do not have "custody." Rather, they have mere possession.

In simple terms, Richard is in the Does' home without color of right. The Does' sole claim to custody of Richard was invalidated by this court on June 16, 1994, when their invalid adoption of Richard was vacated. Since that date, the Does have retained physical possession of Richard but not his custody for purposes of section 601(b)(2).

No one could legitimately suggest that the headmaster of a boarding school or the director of a children's summer camp would have "custody" under the Marriage and Dissolution of Marriage Act so as to give him standing to maintain a custody action against a parent. All he would have is physical possession. With even less authority can such standing be asserted by a nonparent who has physical possession of a child without any authority from the parent or claim of right whatsoever save the passage of time.

To hold otherwise would contravene the twin policies of the Marriage and Dissolution of Marriage Act, which favor the superior rights of parents to the care, custody and control of their children and the deterrence of abductions and other unilateral removals of children from their natural parents. (*In re Marriage of Carey* (1989), 188 Ill. App. 3d 1040, 1048.) If standing under the Act is not predicated upon voluntary relinquishment, the abduction of a child could result in the abductors having standing under section 601(b)(2), a conclusion hardly intended by the legislature and not one this court can countenance. *Peterson*, 112 Ill. 2d at 54.

Moreover, while the birth mother in the instant case might properly be found to have voluntarily relinquished her right to the care and custody of Richard,

her unilateral relinquishment cannot be imputed to Otto. A unilateral relinquishment by one parent cannot serve as the basis for establishing standing under section 601(b)(2) as against the other parent. (See *Sechrest*, 202 Ill. App. 3d at 873.) Indeed, as the appellate court in *Sechrest* correctly noted, any other holding might encourage a vindictive parent to give custody of a child to a nonparent to prevent the other parent from obtaining or exercising custodial rights, the exact situation in the instant case. *Sechrest*, 202 Ill. App. 3d at 873.

We acknowledge that the numerous appellate decisions considering standing under section 601(b)(2) have not always focused on voluntary relinquishment as the sole factor in determining whether the nonparents have standing. However, this is because voluntary relinquishment does not always vest standing in nonparents under the Act. Indeed, many courts engage in a fact-specific investigation to determine whether a nonparent has physical custody of a child in which not only the voluntary relinquishment of the child is considered, but also the intent of the parents when they handed over possession to third parties, the length of the transfer and the facts surrounding the relinquishment. See *In re Santa Cruz* (1988), 172 Ill. App. 3d 775, 783-86 (discussion of factors considered in determining whether a nonparent has physical custody of another parent's child).

None of these cases, however, stand for the proposition that any combination of factors, absent voluntary relinquishment, could afford standing under section 601(b)(2). Indeed, an exhaustive review of every case where section 601(b)(2) standing was at issue discloses that this custody provision has never been invoked to alter parental rights absent some measure of voluntary relinquishment.

Thus, we find that section 601(b)(2) cannot be invoked as against Otto in the instant case because he

has never voluntarily relinquished his right to the care, custody and control of his child. Indeed, quite to the contrary, Otto exhibited sincere and vigorous interest in his child—first to learn the truth of his son's existence and then, upon discovering that his son had been placed for adoption, to obtain his possession. Deceit and subterfuge on the part of the Does and their legal counsel to deny Otto knowledge of, access to, and custody of his son cannot form the foundation for standing under section 601(b)(2).

## STANDING UNDER THE BABY RICHARD AMENDMENT

Less than three weeks after this court issued its June 16, 1994, decision reversing the trial and appellate courts' decisions in this case, the General Assembly held an emergency session during which it passed Public Act 88—550, which amended the Adoption Act (750 ILCS 50/1 *et seq.* (West 1992)). The amendment provides, *inter alia*:

"In the event a judgment order for adoption is vacated or a petition for adoption is denied, the court shall promptly conduct a hearing as to the temporary and permanent custody of the minor child who is the subject of the proceedings pursuant to Part VI of the Illinois Marriage and Dissolution of Marriage Act. The parties to said proceedings shall be the petitioners to the adoption proceedings, the minor child, any biological parents whose parental rights have not been terminated, and other parties who have been granted leave to intervene in the proceedings.

\* \* \*

*This amendatory Act of 1994 applies to cases pending on and after its effective date.*" (Emphasis added.) (Pub. Act 88—550, eff. July 3, 1994 (adding 750 ILCS 50/20(b)).) The Does contend that this recent amendment to the Adoption Act, which gives adoptive parents standing to seek permanent custody of the child in a failed adoption, applies to the instant case. In support, they argue

that the amendment became effective on July 3, 1994, prior to this court's denial of the Does' petition for rehearing and prior to the United States Supreme Court's denial of the Does' writ of *certiorari*. Because of these post-decision petitions, the Does conclude that the instant case was still pending after the effective date of the amendments and thus that the legislation applies. Otto counters that because his rights had been finally adjudicated in this court's June 16, 1994, opinion, applying the amendment retroactively is unconstitutionally violative of the separation of powers doctrine.

The principle of separation of powers is embodied in article II, section 1, of the Illinois Constitution of 1970, which provides: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." (Ill. Const. 1970, art. II, § 1.) This court has observed that the General Assembly is not a court of last resort and it may not attempt to retroactively apply new statutory language to annul a prior decision of this court. (*Roth v. Yackley* (1979), 77 Ill. 2d 423.) While the General Assembly may enact retroactive legislation which changes the effect of a prior decision of a reviewing court with respect to others whose circumstances are similar but whose rights have not been finally decided, it is axiomatic that the General Assembly may not validly enact a statute, the effect of which is to change a decision of this court which has finally adjudicated the rights of particular parties. *Sanelli v. Glenview State Bank* (1985), 108 Ill. 2d 1.

Initially, the Does contend that the amendment does not violate the separation of powers doctrine because their petition for rehearing was pending at the time the amendment became effective. Otto contends that, because this court had finally adjudicated the rights between the parties in its opinion of June 16, 1994, the amendment cannot be constitutionally applied to his

case. We agree. This court has held that the filing of a petition for rehearing does not alter the effective date of the judgment of a reviewing court unless that court allows the petition for rehearing, in which event the effective date of the judgment is the date that the judgment is entered on rehearing. (*PSL Realty Co. v. Granite Investment Co.* (1981), 86 Ill. 2d 291.) Since the petition for rehearing was denied in this case, as was the petition for writ of *certiorari* to the United States Supreme Court, the effective date of judgment was June 16, 1994. On that date, the rights between the parties were finally adjudicated by this court, rendering the subsequent amendment constitutionally inapplicable.

The Does counter that issues of pendency and finality are distinct and that legislation passed after the final adjudication of rights but while petitions for rehearing are still pending can be constitutionally applied retroactively. Though the cases cited by the Does stand for the propriety of applying a new enactment to a pending case when that enactment becomes effective at any stage in the litigation, none of those cases involved an amendment which attempted to alter the vested rights of parties to the litigation after this court had finally adjudicated them. (See *General Telephone Co. v. Johnson* (1984), 103 Ill. 2d 363 (retroactive change in a taxing statute); *Schlenz v. Castle* (1981), 84 Ill. 2d 196 (curative act validating late publication of real estate tax assessments).) Rather, the cases involved changes to rights that were not vested, thus rendering the otherwise unconstitutional retroactive changes constitutional.

As regards the instant case, this court found on June 16, 1994, that Otto had been improperly denied a most fundamental right, the right to the care, custody and control of his son. Because we subsequently denied rehearing on our decision to vacate the adoption, the

date of the final adjudication of Otto's resulting right to custody of Richard for purposes of the instant separation of powers review remains June 16, 1994. (See *PSL Realty*, 86 Ill. 2d at 305.) Thus, the amendment to the Adoption Act cannot be constitutionally applied retroactively.

Our conclusion is further buttressed by this court's decision in *In re Marriage of Cohn* (1982), 93 Ill. 2d 190. In *Cohn*, this court considered the applicability of an amendment to the Marriage and Dissolution of Marriage Act passed by the legislature after the appellate court's resolution of the case, but prior to this court's reviewing opinion. Noting that the legislative history clearly showed that the legislative action was explicitly taken in order to reverse the result reached by the appellate court, this court refused to apply the amendment to the case. (*Cohn*, 93 Ill. 2d at 202-07.) This court reiterated that although the legislature may change the law as interpreted by the courts prospectively, it cannot retroactively alter a statute with the explicit intent to overrule the decision of a reviewing court. *Cohn*, 93 Ill. 2d at 205.

Though the Does acknowledge this court's holding in *Cohn*, they assert that the *Cohn* separation of powers analysis should not be employed in the instant case because, in enacting the amendments at bar, the legislature did not attempt to overrule this court's June 16, 1994, decision vacating the adoption. Rather, the Does argue that the legislature merely sought to make clear what happens after an adoption is vacated, as opposed to altering this court's vacation of the actual adoption.

The Does' attempt to distinguish the vacation of the adoption of Richard from what happens after the vacation of the adoption is without merit. Separation of powers analysis requires an examination of the effect a change in retroactive legislation will have on the

substantive rights of parties already announced by a court and does not turn upon inconsequential distinctions. Earlier in this opinion, we noted that prior to the instant amendment, the vacation of an invalid adoption results in the automatic reversion of custody to any fit parent who has not otherwise consented to the relinquishment of his or her rights to the care, custody and control of the child. Insofar as Otto is fit and has not consented to Richard's adoption, he cannot now be divested of his right to the care, custody and control of Richard by the General Assembly's hastily enacted amendment attempting to overturn the decision of this court.

Looking to the legislative history, as this court did in *Cohn*, we note that the legislature passed the amendment at issue to alter the effect of our June 16, 1994, opinion vesting custody of Richard with Otto. Any doubt in this regard is belied by the readings of the bill before the Senate:

"SENATOR TROTTER: *They're already in the Supreme Court. So they've gone before three tribunals. The way the language [of the amendment] reads, it says, in fact, that they [the Does] can—they can ask for a new case. So are we circumventing the courts at this time?*
\*\*\*

SENATOR CRONIN: Well, first of all, the Supreme Court would have to agree to hear a petition to entertain the idea of remanding this case. They'd have to overturn their decision. They'd have to reconsider their—their unanimous decision, and they'd have to overturn that decision and then remand it to the circuit court. While my personal sympathies are with the adoptive parents, and I think that there are some problems with that case from the outset, my main objective in this legislation is prospective, to insure that Baby Richard cases don't happen again.
\* \* \*

SENATOR TROTTER: The question is, then—then why are we having an immediate effective date? *If you're*

*not—if your intent is not to have an impact on the Baby Richard's case and only on the prospective cases, then why are we saying we have the immediate effective date, which will more than likely have an impact on something that's already gone through these three tribunals,* which is the system that we've set up here in this State?

\*\*\*

SENATOR CRONIN: Maybe I misspoke, or maybe I—said something that was confusing. I can't tell you what the outcome is going to be in terms of its impact on the case. Whether this bill does have an impact on this case is something for the justices to decide. *I—I—I—my intent is, yes, that it would have an impact on Baby Richard and all other cases in the future that are similarly situated.*" (Emphasis added.) 88th Ill. Gen. Assem., Senate Proceedings, July 1, 1994, at 37-38.

This court will not be blind to the circumstances surrounding the enactment of a statute in determining whether it violates separation of powers principles. The legislative branch of Illinois' three-branch government cannot sit as a reviewing court over the decisions of the judicial branch which has adjudicated a suit at law and established and articulated the legal rights of the parties to the litigation. To hold otherwise would render the separation of powers doctrine a nullity and threaten the very fabric of our democracy.

## DUE PROCESS RIGHTS OF RICHARD

The final argument raised both by the Does and Richard's guardian *ad litem* is that Richard himself has a liberty interest in the familial relationship he has developed with the Does. In making this argument, the Does and the guardian *ad litem* fail to address the liberty interest Richard may have in being with his natural father. The United States Supreme Court has never decided whether a child has a liberty interest symmetrical with that of a natural parent in maintaining his current relationship. (*Michael H. v. Gerald D.* (1989), 491 U.S. 110, 130, 105 L. Ed. 2d 91, 110-11, 109 S. Ct.

2333, 2346.) Attempts to assert such a right on behalf of children who have become psychologically attached to a nonparent have not met with success. (See *In re Baby Girl Clausen* (1993), 442 Mich. 648, 502 N.W.2d 649.) We likewise hold that no such liberty interest exists as regards Richard's psychological attachment to the Does. To hold otherwise would be to overturn the entire jurisprudential history of parental rights in Illinois.

In *Smith v. Organization of Foster Families for Equality & Reform* (1977), 431 U.S. 816, 53 L. Ed. 2d 14, 97 S. Ct. 2094, one of the questions before the Supreme Court was whether foster children who have lived in a foster home for an extended period of time, and who have developed a psychological bond with the foster family, have a liberty interest in remaining with that foster family. In addressing this issue, the Court declined to decide whether such a liberty interest existed. Rather, the Court determined that the procedural safeguards employed by New York in removing children from their foster families were constitutionally sufficient to protect whatever interest might be at issue. (*Smith*, 431 U.S. at 847-56, 53 L. Ed. 2d at 37-42, 97 S. Ct. at 2111-15.) The Court did, however, make clear that as between foster parents and natural parents, any such liberty interest on the part of the child was substantially attenuated absent a finding of unfitness or the like. *Smith*, 431 U.S. at 846-47, 53 L. Ed. 2d at 36-37, 97 S. Ct. at 2110-11.

The concurring justices argued that the majority was illogical in considering due process as regards the removal of children from foster families without first establishing that there was a liberty interest, an interest the majority declined to assert existed. (*Smith*, 431 U.S. at 858-59, 53 L. Ed. 2d at 44, 97 S. Ct. at 2117.) The concurring justices further noted that the grievous losses, psychological, emotional and otherwise, that foster children might suffer upon removal to another fam-

ily did not, in and of themselves, create a liberty interest in the continued maintenance of that relationship. (*Smith*, 431 U.S. at 858, 53 L. Ed. 2d at 44, 97 S. Ct. at 2117.) Rather, it is the nature and not the weight of the purported loss that determines whether a liberty interest exists. (*Smith*, 431 U.S. at 858, 53 L. Ed. 2d at 44, 97 S. Ct. at 2117; see also *Board of Regents v. Roth* (1972), 408 U.S. 564, 570-71, 33 L. Ed. 2d 548, 557, 92 S. Ct. 2701, 2705-06.) Turning then to the nature of the liberty interest asserted by the foster children to the continued placement with their foster parents, the concurring justices stated they would squarely hold that the interests asserted by the foster children are not of a kind that the due process clause of the fourteenth amendment protects. (*Smith*, 431 U.S. at 858, 53 L. Ed. 2d at 44, 97 S. Ct. at 2117.) While children have a due process liberty interest in their family life, that interest is not independent of the child's natural parents' interest absent a finding of unfitness.

A similar conclusion is compelled in the instant case. As Justice Stewart concluded in *Smith* upon considering the rights of foster families vis-a-vis natural parents to the care, custody and control of the children: "If a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest, *** [this] would have intruded impermissibly on 'the private realm of family life which the state cannot enter.' " (*Smith*, 431 U.S. at 862-63, 53 L. Ed. 2d at 46-47, 97 S. Ct. at 2119, quoting *Prince v. Massachusetts* (1944), 321 U.S. 158, 166, 88 L. Ed. 645, 652, 64 S. Ct. 438, 442.) Likewise, the putative family relationship that the Does have deceitfully established with Richard, and which has come about in derogation of the procedural safeguards afforded fit fathers under the Adoption Act, cannot now be legitimated.

## CONCLUSION

It would be a grave injustice not only to Otakar Kirchner, but to all mothers, fathers and children, to allow deceit, subterfuge and the erroneous rulings of two lower courts, together with the passage of time resulting from the Does' persistent and intransigent efforts to retain custody of Richard, to inure to the Does' benefit at the expense of the right of Otto and Richard to develop and maintain a family relationship. Moreover, the laws of Illinois, as hereinabove set forth, clearly compel us to order Richard delivered to his father, Otakar Kirchner. Accordingly, we ordered the writ of *habeas corpus* to issue on January 25, 1995, and we hereby reaffirm that order.

We note, finally, that we have considered the dissents offered in this case. The dissent by Justice McMorrow departs from the record, misstates the facts and misinterprets the law. It is, quite simply, wrong in its assertions and wrong in its conclusions. We reiterate that the recitation of facts covered in the majority *per curiam* opinion is well documented in the record of proceedings and that the authorities upon which we have relied solidly support the conclusions we have reached in support of the issuance of the writ of *habeas corpus*.

*Writ awarded.*

JUSTICE MILLER, dissenting:

I do not agree with the majority that we can now conclude, on the evidence before us, that the Does lack standing to request a custody hearing on behalf of the minor child they have unsuccessfully attempted to adopt. A number of factual questions must be resolved before a determination of the Does' standing can be made. Because these threshold issues have not yet been decided, I would direct the circuit court to consider, on an expedited basis, the matters pertinent to this inquiry.

This court's prior decision did not address, much less resolve, the issues raised in the present case. In a majority opinion, and in a separate concurring opinion joined by three members, this court previously determined only that the finding of unfitness entered by the circuit judge could not stand, and that Kirchner's parental rights had therefore been improperly terminated. (*In re Petition of Doe* (1994), 159 Ill. 2d 347.) The earlier case did not decide whether Kirchner's biological relationship to the child is paramount to all other considerations, as Kirchner argues, or, instead, whether a separate hearing should now be conducted to determine what custodial disposition would be in the child's best interests, as the Does contend.

The Does base their right to seek a custody hearing on section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act, which provides that a custody hearing may be initiated "by a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but only if he is not in the physical custody of one of his parents." (750 ILCS 5/601(b)(2) (West 1992).) Once the standing requirements of section 601 are satisfied, section 602 directs the court to "determine custody in accordance with the best interest of the child." (750 ILCS 5/602 (West 1992).) The court is to consider all relevant circumstances in making that determination, and the statute lists a number of matters that should be considered.

The majority concludes that the Does lack standing under section 601(b)(2) to seek a custody hearing on behalf of Baby Richard because the biological father did not voluntarily relinquish custody of the child and because the Does participated in Daniella's deception of Kirchner. In addition, the majority believes that, upon the reversal of an adoption decree, custody of the child

involved must automatically vest in a parent whose rights would otherwise have been terminated by the decree.

As a preliminary matter, I do not agree with the majority that reversal of the adoption decree must necessarily vest custody of the child in Kirchner. The majority recognizes that the Adoption Act (750 ILCS 50/5 through 24 (West 1992)) does not specify the consequences of an adoption decree that is overturned on appeal, yet the majority believes that the procedural safeguards afforded unwed fathers "militate that fathers be placed in the same legal position" afterwards. (164 Ill. 2d at 489.) To the majority, this can be accomplished only by granting the biological parent immediate and exclusive custody of the child, even though the unwed father in this case did not have custody before the adoption.

The majority's conclusion, however, ignores the essential differences between the custody hearing the Does now seek pursuant to sections 601 and 602 of the Marriage and Dissolution of Marriage Act and their earlier, unsuccessful petition to adopt the child. Although these are distinct actions with dramatically different consequences, the majority opinion virtually conflates the two. (164 Ill. 2d at 489-90.) Unlike an adoption decree, however, a custody determination made pursuant to section 602 does not result in a termination of parental rights. See *In re P.F.* (1994), 265 Ill. App. 3d 1092, 1100-01; *In re S.J.K.* (1986), 149 Ill. App. 3d 663, 673.

I would note further that the death of a custodial parent following a divorce decree does not automatically vest the surviving parent with custody of a minor child. (See *In re Marriage of Nicholas* (1987), 170 Ill. App. 3d 171, 178; *In re Custody of McCarthy* (1987), 157 Ill. App. 3d 377, 383; *Milenkovic v. Milenkovic* (1981), 93 Ill. App. 3d 204, 212.) The majority seeks to distinguish

these cases on the ground that the Probate Act specifically authorizes a court to place custody of a minor with a third party on the death of the custodial parent. (See 755 ILCS 5/11—7 (West 1992).) What the majority overlooks, however, is that section 601(b)(2) can perform a similar function in cases such as this, allowing a court to award custody to a third party rather than to a parent. Again, it must be recalled that the Does do not now seek to terminate Kirchner's parental rights.

The majority denies standing to the Does under section 601(b)(2) on the grounds that Kirchner did not voluntarily relinquish custody of the child and that the Does took part in the scheme that allegedly deprived Kirchner of his parental rights. The first reason cited by the majority is not applicable here; the second reason requires a factual determination that should initially be made on a fully developed record in the trial court.

The requirement of a voluntary relinquishment of the child by his or her biological parents is intended to discourage child abductions and other illicit self-help measures that would otherwise grant a third party standing pursuant to the literal terms of section 601(b)(2). (*In re Custody of Barokas* (1982), 109 Ill. App. 3d 536, 544.) This sensible limitation on the availability of relief under that provision is not implicated in the present case, however. Kirchner never had custody of the child to begin with, and therefore he had nothing to relinquish. Indeed, the majority's construction would erect an insuperable bar to the application of these provisions in any case involving an unwed father who is absent at the time of the child's birth and whose parentage is not established prior to the mother's consent for adoption. If one accepts the majority's view that a biological parent must have voluntarily relinquished custody over the child before a nonparent can have standing under section 601(b)(2), then an unwed father

who has never had custody will find himself in a more advantageous position than a married father whose conduct could be found to amount to a voluntary relinquishment.

The majority also concludes that standing must be denied to the Does because they took part in Daniella's deception of Kirchner. I agree with the majority's premise that a nonparent seeking standing under section 601(b)(2) must not have acted illicitly in gaining custody of the child. That inquiry, however, raises a number of important factual questions that have not previously been resolved. Indeed, determinations of standing under section 601(b)(2) are fact-intensive inquiries that require consideration of a number of circumstances. (*In re Kulawiak* (1993), 256 Ill. App. 3d 956, 961-62.) Nonetheless, the majority proceeds to resolve these issues without the benefit of a factual record adequate to support the opinion's conclusions.

An example drawn from the majority's numerous attempts to prejudge the facts in this case will illustrate the difficulty of making these important determinations on the basis of the materials currently before us. The majority suggests that the Does, intending to advance Daniella's scheme to keep the birth of the child a secret from Kirchner, prevailed upon Daniella to give birth to the child in a hospital different from the one originally selected by her and Kirchner. (164 Ill. 2d at 472.) Contrary to the majority's view, however, the evidence presented at the adoption hearing does not resolve this question. The Does did not testify at the adoption hearing, and the record does not show whether they acted in the manner ascribed to them by the majority, or instead whether they or Daniella had legitimate reasons for choosing the particular hospital where the birth occurred. It should be noted, however, that the Does, who were paying the costs of the delivery, lived quite close to

the hospital in question, which could well have been the facility they used for their own medical needs. In addition, it appears that the hospital where the child was born was closer to Daniella's uncle's house in Hillside, where Daniella was then living, than was the hospital she and Kirchner had initially selected in their former neighborhood.

The majority's conclusion that the change in hospitals was part of a scheme to deceive Kirchner is not fairly supported by the evidence now before us; on this record, we simply do not know what led the Does to pick the hospital at issue. This question, and the many other questions raised in the majority opinion regarding the conduct of the adoptive parents and their attorney, should be resolved through an evidentiary hearing, and not on the basis of adverse inferences derived from a previous hearing in which the biological father was found unfit. Unlike the majority, I do not believe that either the slim record in this *habeas* proceeding—an original action in this court, without an evidentiary hearing below—or the lengthier record developed in the earlier adoption action permits us to resolve these questions at this time. Moreover, although the adoption action raised some of the matters pertinent here, the judge who presided at the earlier proceeding did not make, and was not called upon to make, factual determinations that would have preclusive effect on the issue of the Does' standing. The majority's efforts to resolve these questions of fact in this opinion are premature, and I would await a full and complete hearing at which the Does would have the opportunity to testify before deciding the circumstances of the failed adoption.

Pending in the circuit court of Cook County is a petition filed by the Does in which they seek custody of Baby Richard pursuant to sections 601 and 602. In the exercise of our supervisory authority (Ill. Const. 1970,

art. VI, § 16), I would direct the trial judge in that case to consider, on an expedited basis, the question of the Does' standing. At that time the parties could present testimony and other evidence concerning the manner in which the Does acquired custody of Baby Richard. If the judge below found that the Does did in fact have standing, the judge could then proceed, again on an expedited basis, to the best-interests hearing contemplated by section 602.

If a hearing were to become necessary, Kirchner could then assert the presumption recognized by our law that parents whose rights have not been properly terminated have a superior claim to the custody of their offspring. (*People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 208-10.) This court has previously described the nature of the presumption that operates in favor of biological parents:

> "In child-custody disputes it is an accepted presumption that the right or interest of a natural parent in the care, custody and control of a child is superior to the claim of a third person. The presumption is not absolute and serves only as one of several factors used by courts in resolving the ultimately controlling question of where the best interests of the child lie. [Citations.] A court need not find that the natural parent is unfit or has forfeited his custodial rights before awarding custody to another person if the best interests of the child will be served. [Citations.] This standard or 'guiding star' [citation] is a simple one designed to accommodate the often complex and unique circumstances of a particular case." *In re Custody of Townsend* (1981), 86 Ill. 2d 502, 508.

As *Townsend* explains, the presumption in favor of a biological parent is not dispositive. A court conducting a custody hearing pursuant to section 602 must also consider other relevant circumstances. If the Does were found to have standing to seek a custody hearing, Kirchner would have an opportunity to assert the presumption favoring a biological father whose parental rights

have not been terminated and to maintain that Richard's best interests require that custody of the child be placed with him. I believe that these procedures would be sufficient to protect the constitutional rights Kirchner possesses as an unwed father. (See *Lehr v. Robertson* (1983), 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985; *Quilloin v. Walcott* (1978), 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549.) Because I believe that sections 601(b)(2) and 602 together are capable of granting the Does and the child the relief they now seek, I do not consider here the operation or scope of the recent amendment to the Adoption Act that the Does contend also applies to this case (see Pub. Act 88—550, eff. July 3, 1994 (adding 750 ILCS 50/20(b)), or the claim advanced on behalf of the child that he is constitutionally entitled to such a hearing.

Because significant factual questions remain to be resolved in this matter, I would dismiss the complaint for a writ of *habeas corpus* filed by Kirchner in this court and would allow the custody action previously initiated by the Does in the circuit court of Cook County to go forward on an expedited basis. That court, with its ability to receive evidence, is the proper forum to initially determine whether, as a threshold matter, the Does have standing to seek custody of Baby Richard, and, if so, what custodial disposition would be in the child's best interests, considering the presumption in favor of a biological father and the unique circumstances presented here.

JUSTICE McMORROW, dissenting:

"THE GOOD OF THE PEOPLE SHALL BE THE HIGHEST LAW." Cicero 106-43 B.C.

Today, by its total failure to recognize the rights of the child who has come to be known as "Baby Richard" and the rights of adoptive parents in the circumstances

of this case, the majority grants Otakar Kirchner the unfettered right to remove Richard, almost four years old, from the only home and parents he has known. This ruling is extraordinary and in contravention of Illinois law and constitutional protections: the majority permits Richard to be taken by Kirchner from his home of the past four years, and be placed in the home occupied by a man and woman Richard has never seen or known. Significantly, the transfer into the home of these total strangers to Richard is ordered by the majority without any hearing to determine how and when such transfer should occur, and whether the home into which Richard is being placed is in his best interests. In abdication of its duty to minors, and irrespective of the fact that there has never at any time been a hearing at the trial court level at which a record would be developed, the majority issued the writ of *habeas corpus* to forthwith turn over the child to Kirchner.

The majority today sanctions the placement of this child into a home that is strange to him. The majority permits this transfer, although the court has little knowledge of the fitness of the occupants of that home or of the environment in that home. Indeed, the court knows nothing about the character of Kirchner, except that which surfaced from testimony at the adoption hearing. Testimony from various witnesses indicated that the biological mother of the child had characterized Kirchner as being abusive, that she sought and procured residence in a shelter for abused women; that he was a gambler (Kirchner himself testified that he won $28,000 by gambling in Atlantic City in September 1991); that he was too busy to get married to the woman with whom he lived and impregnated, even though they had procured two marriage licenses. This court knows nothing about Kirchner other than the above, and yet, by its ruling, has refused Richard an evidentiary hear-

ing to determine what is in his best interests. It is significant that the child will live in the home occupied by Kirchner and his biological mother, Daniella, who married Kirchner after adoption proceedings were instituted by the Does. Daniella willingly gave up her parental rights to the child, agreed to the adoption, and consistently indicated to the attorney for the Does and the child welfare agency investigating the Does that she would not disclose the identity of the child's father. As stated, she will, along with Kirchner, by this court's order, have Richard living in her home. Thus, Daniella's deceit is being rewarded and she is able to circumvent her relinquishment of maternal rights and custody by this court's ruling.

I dissent because the ruling of the majority is a radical departure from Illinois law of long standing, and is in contravention of the protection given to Richard by the Federal and State Constitutions. More specifically, I dissent for the following reasons:

(1) The application of pertinent sections of the Illinois Marriage and Dissolution of Marriage Act entitles the Does to initiate a custody proceeding to determine the best interests of the child. Illinois law not only recognizes the *standing* of adoptive parents in the circumstances of the Does in the instant case, but Illinois case law also recognizes such adoptive parents as being necessary parties to custody litigation.

(2) The most recent amendments to the Adoption Act mandate that a custody hearing at which the best interests of the child would be considered should take place after an adoption has been vacated.

(3) The procedural due process rights of Richard under the Federal and State Constitutions have been denied to him by this court's ruling. Virtually the entire focus of the majority opinion relates only to the rights of Kirchner, and ignores the rights of Richard and the Does.

(4) The presumption that the natural parent, Kirchner, represents the best interests of the child does not obtain in the facts of this case. Indeed, the majority's determina-

tion that "no one, not even Richard's guardian *ad litem*, stands in a better position than Otto to represent the interests of his son" is clearly erroneous. In fact, Kirchner's interests are adverse to and in conflict with the child's best interests. Consequently, the general presumption should fail. Allowance of the petition for *habeas corpus*, to which I objected, was not well founded.

(5) The majority's conclusions appear to be premised on the fitness of Kirchner, and the majority's unconscionable attribution of fraud, deceit, perjury, and subterfuge to the Does. Perhaps this is the only way the majority can justify its conclusions. However, the record is devoid of evidence that the Does engaged in the conduct ascribed to them by the majority. Rather, the Does' custody of Richard was at all times pursuant to law and court order, affirmed on appeal.

For the foregoing reasons, and the analysis contained further in this opinion, I dissent.

### CORRECTION OF FACTS

Contrary to the majority's statement of the history of this case, I found no evidence in the record to support the repeated charges of "deceit," "lies," and "subterfuge" on the part of the Does and their attorney in connection with the adoption of the child. Kirchner's affirmative defense to the adoption raised the issue of deceit on the part of Daniella, to whom he was married at the time of the adoption hearing on the termination of his paternal rights. He and Daniella testified at that hearing that the two had not sooner married, because he was too busy to arrange a day off that matched her schedule. The baby was born on March 16, 1991, and the Kirchners married in September of that year, at about the time Kirchner filed his petition for declaration of paternity.

Kirchner admitted at the hearing that Daniella never told him that the baby died and that he did not believe it when Daniella's uncle said the baby was dead. The Does did not testify, and Daniella never said that

the Does or their attorney suggested or assisted in her scheme to hide from the biological father, whom she described to the Does' attorney as "abusive" and a "heavy gambler." Testimony of Daniella reveals that when she met the Does she was staying in a shelter for abused women and had signed a contract with that shelter indicating that she was a victim of abuse. She later moved to her uncle's house in a suburb, and gave the Does' attorney her telephone number and address at that location. She admitted at the hearing that she refused at all times to disclose the identity of the man who fathered her child and there is no indication that she ever gave the Does, their attorney, or the investigator from the Cook County Department of Supportive Services any information to help them locate him. Further, there is nothing in the record to indicate that the Does or their attorney had or were able to obtain information regarding Kirchner's identity or residence. Similarly, there is nothing in the record to establish that the Does or their counsel knew of friends or relatives who might have revealed Kirchner's identity or whereabouts.

The record further reveals that while Daniella was discussing the adoption with the Does and their attorney, she was simultaneously calling Kirchner, meeting him at a restaurant, and, two weeks before giving birth, visiting him in his apartment where they engaged in sexual intercourse. The record also indicates that Kirchner had her telephone number at the shelter and was immediately aware of her moving into her uncle's house. The record does *not* indicate that the Does were aware of Daniella's continued contacts with Kirchner, or the fact that he knew where she was at all relevant times.

The record does not support the majority's statement that the Does and their attorney abetted Daniel-

la's scheme to deceive Kirchner. The record does not support the majority's apparent belief that the Does arranged for Daniella to give birth in a suburban hospital, rather than the Chicago hospital near Kirchner's apartment, in order to prevent Kirchner from locating her. At the time she gave birth she was living with her uncle in a suburb, not in Chicago. Moreover, the transcript of the hearing contains an admission by Kirchner that some time after the baby's March 16, 1991, due date, he telephoned her in the hospital. Although he also testified that he called various hospitals and attempted to verify whether the baby had died, by looking through the uncle's garbage cans for diapers, Kirchner admitted that he knew as early as April 1991 that the baby had not died. He did not seek legal counsel at that time, he testified, because "[e]verything takes time."

Daniella moved back into Kirchner's apartment on May 12, 1991, 57 days after the baby's birth. Although Kirchner was then told of the adoption, he did not immediately seek to intervene in the adoption or seek a declaration of paternity and temporary custody of the child. Instead, on June 6, 1991, approximately 82 days after the baby's birth, an attorney filed an appearance on behalf of "Otto Kirchner." The record reveals that the appearance filed on behalf of Kirchner did not identify Kirchner as the putative biological father or the husband of Daniella. Therefore, on that date Kirchner was merely a name to the Does, as far as the court record indicates. Kirchner's appearance was not accompanied by an answer to the adoption petition or other pleading setting forth his claim to be the biological parent of the child. Therefore, there was nothing for the Does and their attorney to respond to, contrary to the majority's statement that as of June 6, 1991, "the adoption proceedings were rendered wholly defective *** [and] *the Does had both a legal and moral duty* to

surrender Richard to the custody of his father. \*\*\* Instead, the Does selfishly clung to the custody of Richard. They have prolonged these painful proceedings \*\*\*." (Emphasis added.) (164 Ill. 2d at 474.) Such statement by the majority is patently unfair and legally inaccurate. The record shows that as of June 6, 1991, the date on which the majority believes that the Does had a legal and moral duty to surrender Richard to the custody of Kirchner, the only document of record was a bare appearance filed by an attorney on behalf of Kirchner. In September 1991, Kirchner filed a petition for declaration of paternity. It was not until several months later, in December 1991, that Kirchner's paternity with respect to the child was ever established by the trial court. At no time did the trial court ever vacate, modify, or reverse its order granting the Does custody of the child. For the Does to turn over custody of the child on June 6, 1991, to Kirchner, who was a total stranger at that time, would have been grossly irresponsible and a violation of the trial court's order appointing them as the child's legal custodians. Again, there was no duty, moral or legal, for the Does to surrender the child to Kirchner.

Nothing in the record supports the majority's further statement, "After protracted procedural posturing on the part of the Does, a hearing was finally had on Otto's petition to defeat the adoption." (164 Ill. 2d at 474.) I found no indication in the record that the delays in the hearing were attributable to anything other than standard discovery requirements to prepare for the hearing. At no time did Kirchner move to expedite the proceedings.

Finally, I am concerned that the majority's opinion places an unprecedented burden on prospective adoptive parents in this State to fully investigate the circumstances of the man who purports to be the biological,

unwed partner of the birth mother. The majority reasons that the Adoption Act "intentionally place[s] the burden of proof on the adoptive parents *** [to make] a good-faith effort to notify the natural father of the adoption proceedings." (164 Ill. 2d at 476, citing 750 ILCS 50/7 (West 1992).) According to the majority, the adoptive parents failed to sustain this burden in the present case, because they "knew that a real father existed whose name the birth mother knew," they "knew that the father, if contacted, would not consent to the adoption," yet they made no "effort to learn the name of the father and to give him notice" of the adoption proceedings. 164 Ill. 2d at 476.

The majority's imposition of a duty on the part of adoptive parents to investigate the identity and residence of a putative biological father is unsupported in Illinois law. The provision of the Adoption Act cited by the majority (750 ILCS 50/7 (West 1992)) places no duty on adoptive parents to discover the identity and residence of a biological father to a child born out of wedlock. The majority cites to no Illinois or Federal law for the proposition that adoptive parents in the Does' position have a duty to investigate and determine the identity and location of the unwed father when the birth mother, for reasons of her own, adamantly refuses to reveal the identity of the person she believes is the father. The majority's unjustified imposition of such a duty in the present case is wholly unprecedented.

## ANALYSIS

### I. *HABEAS CORPUS* AND BEST-INTERESTS HEARING

It should be noted at the outset that throughout its opinion, the majority fails to discern the significant legal difference between the termination of parental rights in an adoption proceeding and the lesser interference with

parental rights in a custody proceeding. Termination of parental rights in an adoption proceeding is regulated by the terms of our Adoption Act (750 ILCS 50/1 *et seq.* (West 1992)) and may occur either upon the voluntary consent of the biological parent (750 ILCS 50/8 (West 1992)) or involuntarily, upon a finding that the parent is "unfit" (750 ILCS 50/1, 8 (West 1992)). Adoption of the child by a third party signifies a total, complete and permanent severance of all parental rights, duties and interests that the biological parent has or may have with respect to the child.

An award of custody and visitation, in contrast, derives from the Illinois Marriage Act (750 ILCS 5/601 *et seq.* (West 1992)). Orders of child custody and visitation under the Marriage Act do not effect a permanent termination of parental rights. Instead, custody and visitation orders provide a lawful avenue for judicial supervision over the exercise of parental rights because of a judicial determination that such custodial arrangements will serve the best interests of the child. See 750 ILCS 5/601 through 610 (West 1992).

The majority opinion begins its analysis of this case under the heading "Jurisdiction to Entertain the *Habeas Corpus* Petition." The majority first considers Kirchner's standing to petition for the issuance of a writ of *habeas corpus* over the objections of Richard's guardian *ad litem.* According to the majority, Kirchner has an exclusive right, presumably based on biological paternity, to act "on behalf of Richard" in pursuing the writ of *habeas corpus* to transfer custody without a best-interests hearing. The majority finds that because Kirchner's paternal rights were improperly terminated by the adoption, "no one, not even Richard's guardian *ad litem,* stands in a better position than Otto to represent the interests of his son. *** [Kirchner] has equal if not greater standing to assert what is in his son's best

interests. To the extent that [Kirchner] disagrees with Richard's guardian *ad litem,* not to mention Richard's current custodians, Otto speaks for Richard and is entitled to file a writ of *habeas corpus* on Richard's behalf." 164 Ill. 2d at 478-80.

These quoted statements, and the analysis proceeding therefrom, contain several legal and logical errors. First, the statements reveal the majority's misconception of the role assigned by law to the child's court-appointed guardian *ad litem.* That role is to represent, in a court of law, no other person than Richard. Kirchner represents his own interests. The Does represent their own *and* Richard's interests, based on their family relationship.

Second, the majority's presumption that Kirchner, as biological father, acts in Richard's best interests fails in the context of a custody battle. In child custody litigation "*a child of the parties *** becomes a ward of the court* [citation], *and the court has the authority and the responsibility to act for the child's care, custody and support until it reaches majority. In discharging this responsibility the court's primary concern obviously is not the wishes of the parents but rather the best interests of the child.*" (Emphasis added.) (*Sommer v. Borovic* (1977), 69 Ill. 2d 220, 233.) When Daniella terminated her parental rights four days after Richard's birth, she effectively placed Richard in the care of the State of Illinois. When this court vacated the adoption, the child became a ward in the court-ordered temporary custody of the Does.

Third, the majority's statements reveal its fundamental misunderstanding of the historical role of *habeas corpus* in child custody matters, which was to furnish the procedure by which persons in Kirchner's position could *invoke the jurisdiction of the circuit court and obtain a hearing on custody.* Such hearing required

the taking of evidence to determine what placement would be in accord with the child's best interests. Typically, a petition for *habeas corpus* was the procedural mechanism for deciding custody outside of divorce or adoption proceedings (see *Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556 (dispute between natural father and adoptive parents); *People ex rel. Elmore v. Elmore* (1977), 46 Ill. App. 3d 504 (dispute between unwed parents)). A natural parent who sought to obtain his or her child after the child had been living in the custody of others was required to file a *habeas corpus* action in the circuit court and participate in a best-interests hearing. (See, *e.g.*, *People ex rel. Strand v. Harnetiaux* (1970), 46 Ill. 2d 424 (dispute between natural mother and paternal grandparents); *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201 (dispute between natural father and his parents).) Although Kirchner styled his pleading to invoke this court's original jurisdiction as a complaint for writ of *habeas corpus*, his objective was not to obtain a hearing for Richard but to prevent one. In *People ex rel. Bukovich v. Bukovich* (1968), 39 Ill. 2d 76, this court observed, "While decisions of this court are infrequent in child custody matters, it is apparent from both our opinions and those of the appellate court that it is proper in this State for a court in a *habeas corpus* proceeding to look into the question of child's best interest before awarding custody. [Citations.]" (*Bukovich*, 39 Ill. 2d at 79; see also *Mahon v. People ex rel. Robertson* (1905), 218 Ill. 171 (in *habeas corpus* proceedings for child custody, best interests of child must be considered).) I am aware of no Illinois precedent that supports the action of the majority in using its *habeas* powers to transfer custody of a child from an established home and family into a new, unfamiliar, and possibly even harmful environment, without any court investigation of facts or supervision of the transfer.

Fourth, no person has challenged Kirchner's standing to participate in a *custody hearing*; but by framing the issue as whether Kirchner has superior "standing" to procure his son's custody by plenary writ, the majority seems to believe that Kirchner is entitled to an irrebuttable presumption, based solely on biology, that he, alone, represents Richard's "best interests." Under this newly minted law, unsupported by cases, the majority grants Kirchner unfettered power to dictate the terms and conditions under which the child he has never seen shall be taken from his current home and family. The impropriety of such a novel holding is exposed by a long line of Illinois cases which emphasize that when custody of a child is in issue, the guiding legal principle is *not* the so-called "superior right" of natural parents over third parties. Rather, such right "only obtains when it is in accord with the best interest of the child. [Citations.]" (*Giacopelli*, 16 Ill. 2d at 565; see also, *e.g., Sullivan v. People ex rel. Heeney* (1906), 224 Ill. 468, 477 (holding that vacation of an adoption for lack of notice to biological father did not require vesting of custody in father if contrary to child's best interests).) The *Giacopelli* court posed this key question, "Giving full consideration to the primary and superior right of the natural parents to the custody of their child, what does the best interest of the child demand?" *Giacopelli,* 16 Ill. 2d at 566.

Because *Giacopelli* obviously contradicts the majority's newly created law of biological determinism, the majority overrules *Giacopelli*. Not only is the holding of *Giacopelli* declared unconstitutional under Federal law but also it is wrongly decided. (164 Ill. 2d at 482.) The majority cites *Quilloin v. Walcott* (1978), 434 U.S. 246, 255, 54 L. Ed. 2d 511, 520, 98 S. Ct. 549, 555, in support of its reasoning that Kirchner need not be "subjected to a best-interests hearing without first being found unfit." As will be shown in a later portion of this dissent,

United States Supreme Court cases do not support Kirchner's biologically based claim of immediate and exclusive entitlement to Richard without regard for the rights Illinois law grants to the Does and to Richard.

The majority also misstates the holding of *Giacopelli*, by characterizing it as a case which "allows the termination of parental rights in adoption proceedings without a finding of unfitness." (164 Ill. 2d at 484.) *Giacopelli* was a *custody* hearing in which the mother who had voluntarily given up her child for adoption joined in her husband's attempt to reclaim the baby several months later. Evidence at a *best-interests hearing* to consider the father's claim for custody revealed that he had committed crimes and was of questionable character. *Giacopelli* upheld the trial court's custody decision, based on the evidence. *Giacopelli* did not hold that an adoption may proceed without the termination of a parent's rights.

The majority manifests further confusion with its erroneous assertion that *Giacopelli* does not comport with *In re Custody of Townsend* (1981), 86 Ill. 2d 502. In *Townsend*, this court recognized that the superior right doctrine in custody cases was but one factor in the best-interests determination. Significantly, in *Townsend*, as in *Giacopelli,* and *Sullivan,* this court's review was from *evidentiary hearings* relating to the child's best interests. In such hearings, the circuit courts considered facts relating to the natural parent's fitness *at the time of the hearing on custody*. In the case at bar, this court has precluded the circuit court from examining any evidence about anything pertinent to custody, including Kirchner's fitness at the present time and the placement of Richard in a home with the mother who voluntarily gave him up for adoption while having her uncle tell Kirchner the child died.

In *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, this court reviewed the evidence adduced in a *habeas corpus* action brought by a natural father to remove his son from the care of the paternal grandfather. On behalf of a unanimous court, Justice Ward wrote:

> "The best interest of the child is the standard and *it is not necessary that the natural parent be found unfit or be found to have legally forfeited his rights to custody*, if it is in the best interest of the child that he be placed in the custody of someone other than the natural parent." (Emphasis added.) (*Livingston*, 42 Ill. 2d at 209, citing *Giacopelli*, 16 Ill. 2d 556.)

In *Livingston*, the trial court heard evidence, which included the opinion of an expert that it would be emotionally and psychologically harmful to remove the boy from his grandfather's home, where he had lived virtually all of his life. Notwithstanding this evidence, the trial court ruled that it was in the boy's best interests to be given to the natural father. This court reversed, holding that the trial court's conclusion was against the manifest weight of the evidence. Noting that the boy and his father were strangers to each other and the child was happy and well-adjusted in his grandfather's home, this court held that the child should be returned to the paternal grandfather's custody, but that the father should be given liberal visitation rights with the view toward developing a relationship with his 12-year-old son.

The majority purports to distinguish *Livingston* from the case at bar as being a "probate case" rather than an "adoption case," and therefore subject to different statutory provisions. The majority's protestations ring hollow. As previously stated, the case at bar is no longer an "adoption case" but has become a custody matter. The reason for a custody hearing is not to circumvent this court's vacation of the adoption; instead, it is to ensure that a child who became a ward of the State upon the

birth mother's relinquishment of her rights is accorded the protections afforded the child by Illinois law and constitutional due process.

More recently, this court unanimously rejected the use of summary judgment procedure to restore a natural parent's custody rights when the child had been in the care of another for years. (*In re Estate of Whittington* (1985), 107 Ill. 2d 169.) In *Whittington,* the legal guardian of a young boy was the child's great aunt. The guardian cared for the boy during the natural mother's confinement in a mental institution after being acquitted, by reason of insanity, of killing her husband. The mother sought the return of her child after she was released from treatment, married, and obtained a court order terminating the conservatorship of her estate. The trial court entered summary judgment in favor of the mother, who sought to terminate the guardianship and take her child back. The appellate court reversed and this court affirmed, stating,

"The paramount standard, then, for determining a custody dispute under the applicable statute and case law is the best interest of the child. *** Of obvious importance in the present case is the capacity of the parties to care for a child appropriately; the length of time Richard has been in the respondent's custody; his adjustment to home, school, and community; the mental and physical health of all the parties involved; and the potential for physical violence and alcohol abuse in the homes in which he might be placed.

*Clearly, a custody decision in a case such as this requires a careful determination of the relevant facts and a sensitive weighing of a series of factors. A summary judgment proceeding is ill suited to such a determination.* *** These facts [raised in the pleadings and affidavits], *as well as the effect of removing seven-year-old Richard from the home in which he has been cared for since he was two months old,* can only be established and weighed at a hearing on the merits at which both parties are free to present

evidence and to cross-examine each other's witnesses." (Emphasis added.) *Whittington*, 107 Ill. 2d at 177-78.

In *Whittington*, the mother's rights to her child had not been terminated, but this court recognized that the child could not be restored to the mother's care without a best-interests hearing. In the case at bar, the majority expressly rejects the need for a hearing before ordering the child to be turned over to the biological father, about whom this court knows nothing, and the biological mother, whose alleged deceit of Kirchner caused this lengthy litigation to commence. The law in Illinois cannot accommodate such disparate and unequal treatment of its smallest citizens. Today, the majority of this court chooses to disregard, overrule, and abandon long-standing child custody precedent of this court.

The majority also omits discussion of the myriad appellate court cases which squarely embrace the best interests of the child principle as determining custody, even if it means that a natural parent who is not found to be unfit temporarily may lose custody to third parties. See, *e.g.*, *Rose v. Potts* (1991), 217 Ill. App. 3d 661 (while the fact that a nonparent has physical custody of a child for a substantial length of time does not neutralize the superior rights doctrine, it may, in a given case, be the determining factor in custody decisions); *In re Custody of Piccirilli* (1980), 88 Ill. App. 3d 621 (affirming custody to grandparents of eight-year-old child who preferred staying with grandparents; father would be entitled to liberal visitation); *Baehr v. Baehr* (1978), 56 Ill. App. 3d 624, 626 (evidence supported trial court's determination that it "would certainly be detrimental to the psychological adjustment of this 10-year-old boy to have the intrusion of his biological father into his life at this time").

This court has recognized that where a father's rights have not been terminated but it is found that the child's best interests lie in remaining in the custody of

others, the father may still seek liberal visitation privileges and the opportunity to develop the parent-child relationship. (*Livingston,* 42 Ill. 2d 201; *Bukovich*, 39 Ill. 2d at 81, quoting *Hohenadel v. Steele* (1908), 237 Ill. 229, 235 (in considering modification of custody rights, " 'decree respecting the custody of a child is exceptional in its character and is always regarded as temporary' ").) Our courts have demonstrated considerable creativity in balancing the respective custodial rights of various people. (See, *e.g., In re S.J.K.* (1986), 149 Ill. App. 3d 663 (foster parents awarded temporary custody of child where visitation by biological mother caused child considerable anxiety; court noted that mother could petition for restoration of rights in future); *In re P.F.* (1994), 265 Ill. App. 3d 1092 (grandmother awarded custody; order did not terminate rights of biological parents, who could later petition for restoration of custody).) The majority opinion fails to grasp that subjecting Kirchner to a best-interests hearing on behalf of his son would not divest him of his parental status or his right to develop a relationship with Richard.

In the case at bar, the majority wrongly assumes that whenever an adoption is set aside, upon a reviewing court's holding that the trial court erred in terminating the biological father's rights, the adoptive parents become legal nonentities and the child, no matter his age, *ipso facto* becomes the rightful property of the biological father. In such a view, the child's welfare, and the familial ties between him and the adoptive family, become totally subordinated to the biological father's wishes. In its haste to restore Richard to his biological parents, the majority denies a voice to the couple who are the only parents Richard knows. By awarding the writ, the majority of this court compels the Does to turn Richard over to virtual strangers, without any assurances that the needs of the boy will be met.

## II. THE DOES' STANDING TO SEEK CUSTODY

The Does' standing to maintain their petition for custody of Richard derives from Illinois statutory and case law, including the long line of *habeas corpus* cases in which the "necessary party" status of persons in the Does' situation was never questioned. Our legislature has enacted specific provisions, pursuant to the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 1992)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 1992)), which prescribe the legal procedures to be followed when a child is subject to competing claims for custody. As explained below, section 601(b)(2) of the Marriage Act implicitly provides for persons in the Does' position to petition for custody of a child who is not in the "physical custody" of a parent. Under the recent amendments to the Adoption Act, persons in the circumstances of the Does are explicitly recognized as necessary participants in a custody hearing following a failed or vacated adoption. Significantly, the Adoption Act amendments demonstrate the legislature's clear intent to insure that longstanding custody law is not defeated by an elevation of the biological parent's rights into an automatic and conclusive presumption that the child's best interest is with that parent.

My conviction that the Does have standing, or legally recognized interest in the outcome of Richard's custody placement, is also partially rooted in common sense, which recognizes their central role in his life as his parents in every sense of the word except biologically. Moreover, they are the only ones who have ever had legal and physical custody of the child, following the voluntary termination of the biological mother's rights four days after the baby was born. Case law reveals that they not only have "standing" but are *necessary and proper parties* to such hearing. *E.g., Mahon v. People ex rel. Robertson* (1905), 218 Ill. 171.

The majority's conclusion that the Does and the guardian *ad litem* lack standing, as a matter of law, stems in part from its erroneous premise, discussed in the previous section, that only Otakar Kirchner has standing to exclusively determine what is in Richard's best interests. Before considering what Illinois statutory law provides on the standing issue, the majority returns to its stated belief that cases of the United States Supreme Court support the supremacy of Kirchner's rights in this case. The majority reaches a holding that clearly derives from its view of Federal constitutional law, despite the majority's statement that its "decision is based solely on Illinois law." (164 Ill. 2d at 486.) The majority holds, "[W]here an unwed father is fit and willing to develop a relationship with and raise his child, but is prevented from doing so through deceit and an invalid adoption proceeding, that father is entitled to the care, custody and control of his child upon the subsequent vacatur of the invalid adoption." 164 Ill. 2d at 489-90.

In later sections of this dissent I discuss the pertinent Federal cases in detail and explain why I believe that the majority's due process analysis is misguided. However, the Illinois statutory provisions on standing are independent of and do not need to refer to Federal due process cases, unless the majority is now holding that section 601(b)(2) is unconstitutional as applied to custody disputes such as the one in the case at bar. The majority opinion does not expressly hold that recognizing the Does' standing under section 601(b)(2) would violate Kirchner's due process rights, but instead concludes that the "procedural safeguards afforded fathers by the Adoption Act militate that fathers be placed in the same legal position after the vacation of an invalid adoption as they were in prior to the invalid adoption's approval." (164 Ill. 2d at 489.) By this state-

ment, the majority apparently and mistakenly assumes that there cannot be a custody hearing following a failed adoption, without a finding of the biological father's unfitness. Moreover, in this case Kirchner's legal position prior to the approval of the adoption was that of an unwed father who did not have custody. The child was a ward of the court in the temporary custody of the prospective adoptive parents.

In its analysis of the Does' standing under section 601(b)(2) of the Marriage Act, the majority begins by asserting that this court's decision of June 16, 1994, is "*res judicata*" as to the finding of this court that Kirchner had exhibited sufficient interest in his child within the first 30 days of his life. The majority then states that *res judicata* "precludes reconsideration of these conclusions in determining the outcome in the instant *habeas corpus* proceeding." (164 Ill. 2d at 486.) Despite such pronouncement, the majority repeatedly returns to its central rationale for finding that the Does lack standing, *i.e.*, that the Does engaged in "deceit," "subterfuge," and the filing of "false pleadings under oath." It has never been suggested by anyone, in the trial court, including Kirchner or Daniella, that the Does' conduct was fraudulent, conspiratorial, or perjurious. Because the Does and their attorney were never charged with, or found guilty of, such grave misconduct in connection with the termination of Kirchner's rights in the adoption proceedings, *and there is no evidence of record to support these irresponsible accusations*, the majority's harsh criticisms cannot be bootstrapped into findings of fact made binding by *res judicata* principles.

Without any evidence in the record, the majority attributes illegal and criminal conduct to the Does in order to support its ultimate conclusion regarding standing: "In simple terms, Richard is in the Does' home without color of right." (164 Ill. 2d at 492.) The major-

ity also holds that the Does do not have "physical custody" within the meaning of section 601(b)(2) of the Marriage Act, but retain bare "possession" of Richard. To explain the errors of law and logic contained in such conclusion an analysis of section 601(b)(2) and the cases that construe it is appropriate.

A. Standing Under Section 601(b)(2)

Various provisions of the Marriage Act permit interested parties to initiate or intervene in a child custody action, and to obtain a best-interests hearing, without the need to resort to *habeas corpus* procedure. (750 ILCS 5/601, 602 (West 1992).) However, like the cases decided under *habeas corpus* procedure, custody cases decided pursuant to section 601 of the Marriage Act require custody determinations to be based on the fundamental best-interests factors, which are codified in section 602. (See, *e.g.,* Ill. Ann. Stat., ch. 40, par. 602, Historical & Practice Notes, at 17 (Smith-Hurd 1980); *Cohn v. Scott* (1907), 231 Ill. 556; *Nye v. Nye* (1952), 411 Ill. 408.) Section 603 of the Act involves temporary custody procedures and section 610 governs the modification of custody based on changed circumstances. 750 ILCS 5/603, 610 (West 1992).

Section 601(b)(2) of the Marriage Act provides that a "child custody proceeding is commenced *** *by a person other than a parent,* by filing a petition for custody of the child in the county in which he is permanently resident or found, but *only if he is not in the physical custody of one of his parents.*" (Emphasis added.) (750 ILCS 5/601(b)(2) (West 1992).) The plain language of section 601(b)(2) reveals that the Does satisfy the literal requirements of the statute.

The phrase "physical custody," as used in section 601(b)(2), has been defined as requiring a determination of who is providing for the care, custody, and welfare of the child prior to the institution of custody proceedings.

(*In re Marriage of Nicholas* (1988), 170 Ill. App. 3d 171.) Physical custody "requires living with the child for an extended period of time. [Citation.]" (*In re Custody of Kulawiak* (1993), 256 Ill. App. 3d 956, 962.) Clearly, Richard has never been in Kirchner's physical custody. Thus, the existence of the Does' standing is premised on the child's day-to-day living in their care and Kirchner's lack of physical custody.

Kirchner acknowledges that the Does appear to have standing under the plain terms of section 601(b)(2) because Richard is not in the "physical custody" of one of his biological parents. However, he argues that the case law requires, as a prerequisite to a nonparent's standing to maintain a custody suit, that the natural parent be shown to have voluntarily relinquished custody or control of the child. Because Kirchner never voluntarily relinquished such custody or control, he argues that the Does cannot establish their standing as a matter of law. The majority adopts Kirchner's argument on this point, and goes further, by reducing the Does' relationship with Richard to mere "possession." Such a construction of section 601(b)(2) is insupportable by reasoned analysis. In fact, the majority's view of the Does' standing assumes that the issue of Richard's custody depends on the same issue that was the subject of the fitness hearing in which Kirchner's paternal rights were terminated. However, as the cases discussed in the prior section of this dissent establish, *the focus of a custody proceeding, whether brought pursuant to habeas corpus or pursuant to sections 601 and 602 of the Marriage Act, is not whether the natural parents' rights have been legally terminated or voluntarily relinquished. Rather, the sole determination for the court to decide in custody matters is what is best for the child.*

The key inquiry in the cases which have discussed the specific standing requirement of section 601(b)(2) is

whether the child is in the "physical custody" of one of the natural parents when the suit is filed by the party seeking custody. (*E.g., In re Custody of Peterson* (1986), 112 Ill. 2d 48.) The question of whether a natural parent has physical custody of his or her child at the time the nonparent files for custody assumes that the natural parent had physical custody to begin with, or had been exercising care and control of the child, or at least enjoyed significant involvement in the minor's life. (See *Peterson*, 112 Ill. 2d 48; *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394.) In the case at bar, the majority does not and cannot conclude that Richard is, or ever has been, in the physical custody, control, or possession of Kirchner. Instead, Richard has *at all times* been in the *lawful custody* of the Does, and the fact that the adoption was invalidated does not alter that basic fact. When this court ruled that the Does' adoption of Richard had been improvidently granted, the Does' legal status as *adoptive parents* changed. However, their familial bonds with Richard did not change. Conversely, while the vacation of the adoption restored Kirchner's paternal right to develop a relationship with Richard, such ruling did not *automatically* vest in Kirchner the right to take immediate control and custody of Richard.

In holding that the Does lack standing because Kirchner did not voluntarily relinquish Richard, the majority relies on cases which are inapposite to the case at bar, particularly *In re Custody of Peterson* (1986), 112 Ill. 2d 48. In *Peterson*, the maternal grandparents sought custody of their grandchild upon the death of the child's mother, who had been living in the grandparents' home with the child. The grandparents' petition for custody asserted that the child was not in the "physical custody" of the father, who was divorced from the mother at the time of her death. The *Peterson* court rejected an interpretation of the statutory phrase "physical custody"

that would have equated it with mere *possession,* noting that the statute was not intended to confer standing on persons who may file for custody based on bare, temporary possession of a child.

The *Peterson* court rejected the maternal grandparents' claim of standing, noting that the child was in the *mother's* custody, not the grandparents', at the time of the mother's death. Moreover, the child's father, who lived close by, had been regularly exercising his visitation rights during the mother's lifetime. The court noted that under such circumstances, "it would not reasonably occur to the father that the maternal grandparents had physical custody of his child and were developing a position of standing, so that upon the death of his wife he could be deprived of his right to custody of his child." (*Peterson,* 112 Ill. 2d at 54.) There had been no transfer of physical custody from the mother to the grandparents, and the "fortuity" of the mother's death was the sole reason the grandparents could assert that the child was not in the father's physical custody at the time they filed their petition for custody pursuant to section 601(b)(2) of the Marriage Act.

Unlike the case at bar, *Peterson* involved the rights of a divorced parent who had maintained his relationship with his child during the life of the mother, and who could not be deemed to have lost "physical custody" of the child, within the intent of section 601(b)(2), upon the custodial parent's death. The instant case involves significantly different facts, and the Does' standing is based on the reality that they have been the sole and legal custodians of Richard since four days after his birth. The majority's holding that the Does lack standing because Kirchner did not voluntarily relinquish his paternal rights requires the majority to redefine the legislature's phrase "physical custody" and to distort the decisional law interpreting that phrase.

Two decisions cited with approval in *Peterson* illuminate the proper application of the standing requirement of section 601(b)(2): *In re Custody of Barokas* (1982), 109 Ill. App. 3d 536, and *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394. In *Barokas,* the mother had placed her child in the temporary care of a family member, who later turned the child over to a third party who had often baby-sat the child as an overnight guest. This third party filed suit for custody on the basis that the child was not in the natural mother's physical custody at the time the suit for custody was initiated. The appellate court held that the mother had not intended to relinquish actual custody of the child within the meaning of the statute and therefore the third party lacked standing to maintain a custody action.

In *Menconi,* the court held that grandparents who sought custody of their grandchild did have standing to file for custody, notwithstanding the natural father's objections. The mother of the child had died shortly after the baby's birth and the father asked his parents to care for the baby. The grandparents took over the child's care and the father visited only for short intervals. After $6^1/_2$ years, the father forcibly removed his child from the home of his parents, and refused to return the child. The court in *Menconi* held that the grandparents had standing to seek custody, even though the natural father, at the time the grandparents filed their custody petition, had physical "possession" of the child.

In *In re Marriage of Carey* (1989), 188 Ill. App. 3d 1040, a stepmother was held to have standing to petition for custody of her stepchild upon the death of the father, notwithstanding the rights of the natural mother. The court found that the stepmother and child had developed a mother-son relationship during the years they had lived with the father. The court noted that although the natural mother had exercised her

visitation rights, she had not provided for the care, custody, and welfare of the child in such manner that when the father died the court was required to find that physical custody of the child was in the natural mother. See also *Montgomery v. Roudez* (1987), 156 Ill. App. 3d 262 (nonparent had standing to counter-sue for custody, pursuant to section 601(b)(2) of Marriage Act, in *habeas corpus* proceedings brought by unwed, teenaged mother who had signed equivalent of irrevocable consent to adoption).

The above cases indicate that the standing requirement of section 601(b)(2) has not been not used as an artificial barrier to prevent genuine claims of custody by persons who have cared for the child on a daily basis in the role of parents. Rather, the statute prevents temporary caretakers, or persons living with the child's custodial parent, from asserting custodial rights in children who have been left in their care for limited periods of time. Therefore, the majority's expressed concern that a headmaster of a boarding school or the director of a children's summer camp might wrest custody from the natural parents under the guise of section 601(b)(2) is totally unfounded. The majority's conclusion that the Does have "even less authority" to seek standing than headmasters and camp directors is patently absurd. 164 Ill. 2d at 492.

The standing requirement has been viewed as intended to protect both the custody rights of the natural parent and the environmental stability of the child, and therefore it has been observed that the determination of whether a "nonparent's" standing has been established depends on the particular facts involved. (See *Kulawiak*, 256 Ill. App. 3d at 961 (there is "[n]o single fact or litmus test" which controls the finding of physical custody for purposes of standing); *In re Marriage of Santa Cruz* (1988), 172 Ill. App. 3d 775, 783 (rel-

evant facts include who has immediate physical possession of the child; how the person took over control; and the nature, manner, and duration of possession).) The Does acted in accordance with the law throughout these proceedings and they were not accused of or found guilty of fraud or collusion in the adoption court.[2] As to the nature, manner, and duration of their "possession" of Richard, clearly the Does have formed a strong familial relationship with him.

The majority acknowledges that the numerous appellate cases that have construed the standing requirement of section 601(b)(2) "have not always focused on voluntary relinquishment as the sole factor" but concludes that "an exhaustive review" of such cases discloses that "this custody provision has never been invoked to alter parental rights absent some measure of voluntary relinquishment." (164 Ill. 2d at 493.) Because custody hearings do not, and cannot, terminate all parental rights, the majority's reliance on the voluntary relinquishment concept is misplaced.

Although this court previously overturned the circuit court's factual determination and thereby vacated the adoption, it should be remembered that Kirchner's legal status at the time Daniella gave up the baby for adoption was that of an undisclosed sexual partner of the birth mother. The Kirchners were not then married and therefore there was no legal presumption that he was the father. The transcript of the hear-

---

[2]As noted above, no issue relating to the Does' conduct was presented in the hearing on the termination of Kirchner's rights, in the adoption proceeding. The circuit court did not find, or even suggest, that the Does colluded with Daniella to deceive Kirchner. At no time was there any suggestion that the Does should be held responsible for Kirchner's alleged inability to discover and assert his rights. The majority's unfounded charges are wholly devoid of support in the record and thus constitute an unconscionable indictment and conviction of the Does and their attorney.

ing to terminate his paternal rights contains Kirchner's admission that Daniella never told him the baby died and that he did not believe her uncle's statement to that effect. Testimony of the uncle corroborates that Kirchner did not believe the baby had died. Even if he was unable to ascertain the baby's whereabouts initially after its birth on March 16, 1991, he admitted that he knew of the adoption by no later than May 12, 1991, when Daniella moved back into his apartment. His attorney did not file any pleading or legal document regarding Kirchner's paternity when the attorney filed his appearance form on June 6, 1991. The court-appointed guardian *ad litem* told the court that Kirchner's testimony of having been deceived was not credible. The guardian *ad litem* also expressed the opinion, based on the evidence, that the real reason Kirchner was seeking to prevent the adoption was because Daniella wanted to get the child back. The trial court ruled that the evidence established that Kirchner did not take sufficient steps to establish the necessary interest in the infant during the statutory 30-day period following the child's birth. As a result, that court terminated Kirchner's rights pursuant to Illinois adoption law. Consent to the adoption was not required by law. Although this court's vacation of the adoption changed Kirchner's legal status, and restored his paternal rights, it does not follow, in law or logic, that he was thereby retroactively vested with *physical custody* of Richard to defeat the *standing* of the Does.

As noted, the majority's failure to recognize the Does' standing is largely premised upon its inaccurate view of the legal effect of the failed adoption. In this court's prior opinion, we held only that Kirchner's legal right to prevent the adoption, through timely assertion of his rights as an unwed biological father, had been erroneously terminated. We did *not* hold, in our prior

opinion, that custody of the child became legally vested in Kirchner, *nunc pro tunc*, as a result of the failed adoption. The effect of vacating a legally entered decree of adoption because a parent's rights were improperly terminated is entirely distinct from the issue of what hearing is necessary when the biological parent seeks to take over control and custody of a child who is living in his adoptive family's home at the time the court invalidates the adoption.

To blunt the argument that the Does have standing in the eyes of the law the majority implies that the adoption was *"void ab initio"* because it was obtained through lies, deceit, and subterfuge imputed to the Does. Thus, the majority attempts to bootstrap its conclusions by this highly unfair and extremely inaccurate characterization of the prior adoption proceedings. By casting the Does and their attorney as lawbreakers, the majority attempts to strip the Does of their legal standing to maintain a best-interests custody determination.

### B. Adoption Act Amendments

The Does' standing to seek custody of Baby Richard is further recognized in the recent amendments to the Adoption Act (Pub. Act 88—550, eff. July 3, 1994). This legislation was enacted while the Does' adoption case was pending before this court upon petition for rehearing. The amendments modify the Adoption Act to explicitly grant standing to nonbiological parents whose adoption request has been denied or vacated. In pertinent part, section 20 of the Adoption Act was amended to read as follows (the new language is shown in italics):

> *"Proceedings under this Act shall receive priority over other civil cases in being set for hearing.*
>
> No matters not germane to the distinctive purpose of a proceeding under this Act shall be introduced by joinder, counterclaim or otherwise.

*An appeal from a judgment order for adoption or other appealable orders under this Act shall be prosecuted and heard on an expedited basis, unless good cause for doing otherwise is shown.*

In the event a judgment order for adoption is vacated or a petition for adoption is denied, the court shall promptly conduct a hearing as to the temporary and permanent custody of the minor child who is the subject of the proceedings pursuant to Part VI of the Illinois Marriage and Dissolution of Marriage Act. The parties to said proceedings shall be the petitioners to the adoption proceedings, the minor child, any biological parents whose parental rights have not been terminated, and other parties who have been granted leave to intervene in the proceedings.

This Act shall be liberally construed, and the rule that statutes in derogation of the common law must be strictly construed shall not apply to this Act.

\* \* \*

*This amendatory Act of 1994 applies to cases pending on and after its effective date."* (Pub. Act 88—550, eff. July 3, 1994, adding 750 ILCS 50/20(b).)

The referenced part VI of the Illinois Marriage and Dissolution of Marriage Act provides in pertinent part that a nonparent may seek custody of a child when the child is not in the custody of a parent. 750 ILCS 5/601 *et seq.* (West 1992).

The amendments to the Adoption Act contain mandatory language reflecting the plain intent of the legislature, to provide for expedited custody hearings when adoption petitions are denied or adoption judgments are vacated. Necessary parties to such proceedings are the petitioners in the adoption proceeding and any biological parent whose rights have not been terminated. These unambiguous provisions grant the Does direct standing to participate in a hearing regarding Richard's custody. Therefore, unless the amendments do not apply or are held to be constitutionally infirm, Kirchner's challenge to the Does' standing in a custody hearing is wholly foreclosed.

The majority rules that the amendments "cannot be constitutionally applied retroactively" to the instant case. The majority posits that the amendments do not apply because they took effect after this court had "finally adjudicated" the parties' rights in the adoption case, on June 16, 1994. The amendments became effective on July 3, 1994. Although the Does' avenues of appeal had not been exhausted until well after July 3, the majority holds that, because the petitions for rehearing and petitions for writ of *certiorari* in the adoption case were denied, the effective date of the final judgment was June 16, 1994, the date on which this court entered judgment in the prior appeal.

This reasoning lacks merit and supporting authority. The appeal in the adoption case was not final, but was still pending, when the new enactments relating to custody hearing procedures following failed adoptions went into effect. With respect to when a case was "finally decided," for purposes of applying new legislation, this court has held, "Where the legislature changes the law pending an appeal, the case must be disposed of by the reviewing court under the law as it then exists, not as it was when the judgment was entered in the lower court." (*Bates v. Board of Education, Allendale Community Consolidated School District No. 17* (1990), 136 Ill. 2d 260, 268-69.) The court in *Bates* also held:

> "[A]n appeal is a continuation of the same case [citation] [and] it follows that until either the time to appeal has expired or, if an appeal is being pursued, until the court of review has rendered a decision, the judgment is not a final adjudication." *Bates*, 136 Ill. 2d at 269.

Based on the *Bates* holding, the case involving the Does' adoption order was still pending on July 3, 1994, when the amendments to the Adoption Act became effective. On that date, the Does' petition for rehearing was still pending, and the time in which to seek further review from the United States Supreme Court had not

yet passed. Until rehearing was denied and the United States Supreme Court denied review by *certiorari*, the case was still "pending" in the courts and was not yet "final" for the purpose of applying the recent amendments to the Adoption Act. In addition, this court stayed its mandate in the instant case pending review by the United States Supreme Court. Unless and until the mandate issues, there is no final or enforceable judgment.

The majority cites one case in support of its holding that "the filing of a petition for rehearing does not alter the effective date of the judgment of a reviewing court" if the petition is later denied. (*PSL Realty Co. v. Granite Investment Co.* (1981), 86 Ill. 2d 291, 305.) However, *PSL Realty* has no application to the instant case. That case did not consider or decide the issue presented here, which is simply whether legislation that is enacted while an action is pending before this court on petition for rehearing may be applied to the case that is pending. The proper view of the issue before this court is that expressed in *Bates*, which held that a suit is still pending, for the purpose of applying recently enacted legislation, so long as the time for requesting appellate review has not yet been exhausted.

The rationale of *Bates* is also consistent with precedent of the United States Supreme Court, which has held that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." (*Bradley v. School Board of the City of Richmond* (1974), 416 U.S. 696, 711, 40 L. Ed. 2d 476, 488, 94 S. Ct. 2006, 2016; see also *United States v. Schooner Peggy* (1801), 5 U.S. (1 Cranch) 103, 2 L. Ed. 49.) These principles apply whether the intervening change in the law derives from a constitutional amendment, a statutory amendment, or a judicial

decision by a court of greater authority. (*Bradley*, 416 U.S. at 715, 40 L. Ed. 2d at 490, 94 S. Ct. at 2018.) A judgment is "final," thus taking it beyond the effect of a change in the law, when the " 'availability of appeal' has been exhausted or has lapsed, and the time to petition for certiorari has passed." *Bradley*, 416 U.S. at 711 n.14, 40 L. Ed. 2d at 488 n.14, 94 S. Ct. at 2016 n.14, quoting *Linkletter v. Walker* (1965), 381 U.S. 618, 622 n.5, 14 L. Ed. 2d 601, 604 n.5, 85 S. Ct. 1731, 1734 n.5.

In light of this precedent, the Does' appeal from the vacation of the adoption was still pending, and was not yet "final" when the amendments to the Adoption Act became effective. The majority does not refer to any of the above cases in its determination that the "retroactive" application of the Adoption Act amendments to the case at bar is constitutionally prohibited. Instead, the majority suggests that the application of the amendments would "alter the vested rights of parties." (164 Ill. 2d at 496.) Again, the majority views the vacatur of the adoption on June 16, 1994, as the vesting of rights in Kirchner, who "had been improperly denied a most fundamental right, the right to the care, custody and control of his son." (164 Ill. 2d at 496.) Kirchner's "right" to custody of Richard could not have "vested" when this court's decision was announced last summer, since that ruling did not pertain to, consider, or decide custody of Richard.

The Illinois Attorney General filed a brief in this court, defending the constitutionality of the amendatory legislation. The Attorney General's argument is largely premised on the fact that the circuit court's application of the *custody* hearing procedures of the new amendments would not alter or reverse this court's opinion, which set aside the *adoption*. Instead, the amendments clarify the procedures that are to be followed after an adoption is vacated, which thereby obviates the need to

rely on section 601(b)(2) or *habeas corpus* to commence a custody hearing. However, according to the majority, the "attempt to distinguish the vacation of the adoption of Richard from what happens after the vacation of the adoption" is meritless because the separation of powers analysis "does not turn upon inconsequential distinctions. Earlier in this opinion, we noted that prior to the instant amendment, the vacation of an invalid adoption results in the *automatic reversion of custody* to any fit parent who has not otherwise consented to the relinquishment of his or her rights to the care, custody and control of the child." (Emphasis added.) 164 Ill. 2d at 498.

My research reveals no Illinois case, prior to the majority's instant opinion, which stands for the proposition that when an adoption is vacated, custody of a child "automatically reverts" to an unwed biological father who never had custody of the child in the first place. Indeed, all of the law I have reviewed is to the contrary. (See, *e.g., Sullivan v. People ex rel. Heeney* (1906), 224 Ill. 468, 477 ("it does not follow *** from the invalidity of the [adoption] decree, that the relator is entitled to the custody of the child").) Any "automatic reversion" of custody following the vacation of the adoption was not in Kirchner, who never had custody, but to the guardian *ad litem,* whose court-appointed role was to represent Richard, who was, and is, a ward of the court. It was not until the majority granted the instant writ that Kirchner's right to immediate custody of Richard can be said to have vested by any order of this court. Before that date there was in effect a valid order of the circuit court, which granted temporary custody to the Does, to maintain the *status quo* pending the best-interests hearing.

A further consideration militates against the argument that application of the Adoption Act amendments

would violate principles of separation of powers. It is well established that the legislature may not enact a statute that dictates the resolution of facts in a pending action, but may enact legislation that "mandates which law the court is to apply to the facts in pending cases." (*Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 570.) The amendments to the Adoption Act at issue here do not attempt to dictate any factual resolutions with respect to pending issues regarding whether the Does should retain custody of the child. Rather, the purpose of the amendments is to clarify applicable legal principles, so that parents who have been granted adoption, but are divested of this adoption right on appeal, nevertheless retain standing to seek custody of the child. Although Illinois case law recognized the right of these nonbiological parents to seek custody after an adoption has been set aside, and section 601 of the Marriage Act may be construed to apply to such nonbiological parents, the enactments are important because they explicitly recognize and accord to such parents the statutory right of necessary party status under the Adoption Act. "Where, as here, an amendment is enacted soon after controversies have arisen regarding the statute [that was] amended, it is logical and reasonable to regard the amendment as a legislative interpretation of the original statute. [Citation.]" (*People v. Badoud* (1988), 122 Ill. 2d 50, 56.) From this analysis it is apparent that the amendments to the Adoption Act, as applied to the instant cause, do no violence to principles of separation of powers. A strong presumption of constitutionality attaches to the General Assembly's laws, and the burden rests on the party who seeks to invalidate the statute. (*General Telephone Co. v. Johnson* (1984), 103 Ill. 2d 363.) In the case at bar, Kirchner did not satisfy his burden, and the majority's efforts to aid him are unpersuasive.

## III. AWARDING THE WRIT OF *HABEAS CORPUS* "FORTHWITH" VIOLATED RICHARD'S CONSTITUTIONAL RIGHTS

This court found in its previous decision that Kirchner had, in effect, sufficiently grasped the opportunity to develop a relationship with Richard. (See *Lehr v. Robertson* (1983), 463 U.S. 248, 262, 77 L. Ed. 2d 614, 627, 103 S. Ct. 2985, 2993.) However, Kirchner's effort to "grasp the opportunity" to develop a relationship with Richard does not give Kirchner the right to summarily and arbitrarily deprive Richard of procedures provided to the child under Illinois law which protect Richard's emotional and psychological relationship with the Does.

The majority's summary decision to grant Kirchner's petition for a writ of *habeas corpus* violates Richard's right to procedural due process under the fourteenth amendment of the United States Constitution. As noted previously, the issue of custody is different from the issues of adoption and the improper termination of parental rights. Unlike a termination of parental rights, which is concerned primarily with protecting the rights of parents, a change or modification of an existing custodial relationship is primarily concerned with protecting the child's interest in a healthy, stable environment. Under the Marriage Act and section 20 of the Adoption Act, the Illinois legislature created a constitutionally protected liberty interest in a child's emotional and psychological relationship with nonparent custodians, and has also provided the requisite procedures to prevent the summary or improper severing of this relationship in a way that would be harmful to the child. (750 ILCS 5/601(b)(2) (West 1992); Pub. Act 88—550, eff. July 3, 1994 (adding 750 ILCS 50/20(b)).) By ignoring the child custody procedures provided by the Marriage Act and section 20 of the Adoption Act, the majority has arbitrarily deprived

Richard of due process under the law by disregarding the intent of the legislature.

On the issue of Richard's constitutional rights, the majority makes two erroneous assertions: (1) that Richard has no constitutionally protected interest in his relationship with the Does, and (2) although children "have a due process liberty interest in their family life, that interest is not independent of the child's natural parents' absent a finding of unfitness." (164 Ill. 2d at 501.) Regarding the first assertion, it is true that the Supreme Court has not yet "decided whether a child has a liberty interest symmetrical with that of a natural parent in maintaining his current relationship." (164 Ill. 2d at 499, citing *Michael H. v. Gerald D.* (1989), 491 U.S. 110, 130, 105 L. Ed. 2d 91, 110-11, 109 S. Ct. 2333, 2346.) However, this observation acknowledges only those constitutional protections that arise from fundamental rights. Under procedural due process, constitutional protection may arise from liberty interests created by State statute. (*Vitek v. Jones* (1980), 445 U.S. 480, 488, 63 L. Ed. 2d 552, 562, 100 S. Ct. 1254, 1261.) The State of Illinois has conferred upon Richard a liberty interest in his emotional and psychological relationship with the Does. The State cannot deprive Richard of this interest without following the procedures provided by State statute. On the second assertion, the majority has again confused the issues of the termination of parental rights and the determination of custody. In custody litigation, the interests of parents and children often diverge.

While the Supreme Court long ago rejected the idea that a child is "the mere creature of the State" (*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary* (1925), 268 U.S. 510, 535, 69 L. Ed. 1070, 1078, 45 S. Ct. 571, 573), the State does have a substantial interest in providing minors with healthy and stable environ-

ments, an interest manifested in the wide variety of child welfare and child protection legislation. (*O'Connor v. Donaldson* (1975), 422 U.S. 563, 583, 45 L. Ed. 2d 396, 411, 95 S. Ct. 2486, 2497 ("States are vested with the historic *parens patriae* power, including the duty to protect 'persons under legal disabilities to act for themselves' "), quoting *Hawaii v. Standard Oil Co.* (1972), 405 U.S. 251, 257, 31 L. Ed. 2d 184, 189, 92 S. Ct. 885, 888; see also *Prince v. Massachusetts* (1944), 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438 (States may impinge on parents' first amendment rights to protect the well-being of children through the enforcement of child labor laws).) It was pursuant to the historic power of *parens patriae* that the State legislature passed the Marriage Act which requires that any child custody determination be in accord with the child's best interests. While the United States Supreme Court has found a substantive due process right in protecting family relationships against State interference (see *Pierce*, 268 U.S. 510, 69 L. Ed. 2d 1070, 45 S. Ct. 571 (parents' right to send children to private parochial schools); *Wisconsin v. Yoder* (1972), 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (right to keep Amish children home after the eighth grade); *Moore v. City of East Cleveland* (1977), 431 U.S. 494, 52 L. Ed. 2d 531, 97 S. Ct. 1932 (right of an extended family to live together); *Santosky v. Kramer* (1982), 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (right to higher burden of proof in order for the State to terminate parental rights)), all of these decisions rest on the presumption "that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.* (1979), 442 U.S. 584, 602, 61 L. Ed. 2d 101, 118, 99 S. Ct. 2493, 2504.

The legal presumption that parents will act in the best interests of their children fails in the context of a custody battle. Illinois has long rejected the idea that

children are chattel, and has embraced the concept that custody should be adjudicated according to the child's best interest. (*Cohn v. Scott* (1907), 231 Ill. 556, 558 (stating that the welfare of the child is the paramount consideration to which the claims of all other persons must yield).) The Illinois legislature has recognized that custody battles, by their very nature, may force competing parties into a struggle that unnecessarily elevates the rights of the competing adult parties to the detriment of the child's interests. (See 750 ILCS 5/601(b)(2) (West 1992); Pub. Act 88—550, eff. July 3, 1994 (adding 750 ILCS 50/20(b)).) This is why in child custody litigation "a child of the parties to it becomes a ward of the court [citation], and the court has the authority and the responsibility to act for the child's care, custody and support until it reaches majority. In discharging this responsibility the court's primary concern obviously is not the wishes of the parents but rather the best interests of the child." (*Sommer v. Borovic* (1977), 69 Ill. 2d 220, 233 (citing *Kelley v. Kelley* (1925), 317 Ill. 104, 110, and *McDonald v. McDonald* (1973), 13 Ill. App. 3d 87, 90); see also *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394 (noting that the superior rights doctrine and the policy of fostering a stable home environment were in direct conflict).) When Daniella terminated her parental rights four days after Richard's birth, she effectively placed Richard in the care of the State of Illinois, and he became a ward of the State. The State now has the duty to care for Richard's health and emotional stability. In the present case, where two parties are competing for the custody of a child, Illinois law properly recognizes that the interests of the adult parties may conflict with the interests of the child. Therefore, custody is properly adjudicated in accordance with the child's best interests rather than the interests of the competing adults. 750 ILCS 5/602 (West 1992).

The United States Supreme Court recognizes that "[m]inors, as well as adults, are protected by the Constitution and possess constitutional rights." (*Planned Parenthood v. Danforth* (1976), 428 U.S. 52, 74, 49 L. Ed. 2d 788, 808, 96 S. Ct. 2831, 2843.) Further, the Court has "repeatedly held that state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." (*Vitek,* 445 U.S. at 488, 63 L. Ed. 2d at 561-62, 100 S. Ct. at 1261; see also *Wolff v. McDonnell* (1974), 418 U.S. 539, 557, 41 L. Ed. 2d 935, 951, 94 S. Ct. 2963, 2975 (due process mandates the provision of procedures to prevent the arbitrary deprivation of a right created by State statute).) In order for a statute to grant a person a protected liberty interest, the person must " 'have a legitimate claim of entitlement' " to the liberty interest. (*Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex* (1979), 442 U.S. 1, 7, 60 L. Ed. 2d 668, 675, 99 S. Ct. 2100, 2104, quoting *Board of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 577, 33 L. Ed. 2d 548, 561, 92 S. Ct. 2701, 2709.) A liberty interest created by statute includes the right to the requisite procedures necessary to protect that liberty interest. (*Connecticut Board of Pardons v. Dumschat* (1981), 452 U.S. 458, 463, 69 L. Ed. 2d 158, 164, 101 S. Ct. 2460, 2463, citing *Wolff,* 418 U.S. at 557, 41 L. Ed. 2d at 951, 94 S. Ct. at 2975.) The extent of constitutional due process protection is not limited to the protection of fundamental rights. Therefore, as our Supreme Court has ruled, "a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff,* 418 U.S. at 558, 41 L. Ed. 2d at 952, 94 S. Ct. at 2976.

In the instant case, the majority has arbitrarily deprived Richard of his statutory right to have his custody determined in a best-interests hearing. Under Illinois law, section 602 of the Marriage Act grants Richard the "legitimate claim of entitlement" to have his custody determined in a hearing "in accordance with [his] best interest." (750 ILCS 5/602(a) (West 1992).) In section 602, the Illinois legislature created a constitutionally protected liberty interest in a child's emotional and psychological relationship with the child's nonparent lawful custodians. Richard's due process liberty interest is the statutory right to have any change in his custody adjudicated in a hearing in accord with his "best interests." In a custody hearing, the trial court has broad discretion to tailor custody arrangements to a wide variety of circumstances and modify custody orders. (See 750 ILCS 5/603 (temporary orders); 610 (modification) (West 1992).) Under the Marriage Act and section 20 of the Adoption Act, a best-interests hearing takes place whenever there is a change or modification of custody. A child's right to a best-interests custody hearing is a procedure necessary to protect the child's relationship with his third party legal custodians against summary and arbitrary termination. In protecting Richard's relationship with the Does, the State protects Richard's emotional and psychological well-being.

The granting of Kirchner's writ of *habeas corpus* effectively extinguished Richard's opportunity to receive a best-interests custody hearing. The trial court has jurisdiction under the Marriage Act and section 20 of the Adoption Act to adjudicate Richard's custody. The trial court is also the proper forum to conduct a fact-finding hearing that would result in a custody determination in accord with Richard's best interests. Since this court found that Kirchner's parental rights were improperly terminated, a valid adoption of Richard by the Does

could not be granted absent Kirchner's voluntary termination of his parental rights. Termination of parental rights is the necessary prerequisite to granting a valid adoption.

However, in a custody dispute, the best interest of the child is of paramount importance. In dispensing with a custody hearing, the majority has placed the emotional and psychological well-being of a small child in danger. (Goldstein, Freud, & Solnit, Beyond the Best Interests of the Child (1973) (when a child is removed from his or her home, the child's emotional ties to his or her parents are disrupted and the child will likely be traumatized).) One of the purposes of a custody hearing is to provide for an orderly change or modification in custody without exposing the child to risk of undue harm. At such a custody hearing, Kirchner's important rights will be considered along with the other relevant factors. The granting of the writ of *habeas corpus* to Kirchner, as the majority has done, ignores the State's valid interest in the psychological and emotional health of its children and unconstitutionally deprives Richard of a best-interests custody hearing, granted to him by the Illinois legislature.

## IV. THE RIGHT TO A CUSTODY HEARING PROVIDED FOR IN THE MARRIAGE ACT AND THE ADOPTION ACT DOES NOT IMPINGE ON KIRCHNER'S CONSTITUTIONAL RIGHT AGAINST STATE INTERFERENCE

The majority rejects long-standing Illinois law and replaces it with a determination that a biological father is entitled to automatic and exclusive custody of a child after the vacation of an adoption order. To support its conclusion, the majority declares unconstitutional the holding in *Giacopelli*, 16 Ill. 2d 556 (biological parent's superior right to custody of child must be subordinated to best interests of child in a custody determination).

In declaring *Giacopelli* unconstitutional, the majority (164 Ill. 2d at 482, 501) relies upon Justice Stewart's concurrence in *Smith v. Organization of Foster Families for Equality and Reform* in which he stated:

"If a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest, \*\*\* [this] would have intruded impermissibly on the private realm of family life which the state cannot enter." *Smith v. Organization of Foster Families for Equality & Reform* (1977), 431 U.S. 816, 862-63, 53 L. Ed. 2d 14, 46, 97 S. Ct. 2094, 2119 (Stewart, J., concurring in the judgment, joined by Burger, C.J., and Rehnquist, J.).

See also *Quilloin v. Walcott* (1978), 434 U.S. 246, 255, 54 L. Ed. 2d 511, 520, 98 S. Ct. 549, 555.

In *Smith*, the United States Supreme Court addressed the due process claims of a group of foster parents who sought additional procedural protection before the State could remove children who had been in the care of the foster parents for a year or more. In searching for the proper level of constitutional protection available to familial relationships, the *Smith* Court sought to define the family in constitutional terms. (*Smith*, 431 U.S. at 842-44, 53 L. Ed. 2d at 33-35, 97 S. Ct. at 2108-09.) According to the *Smith* Court, the "natural" family, which is accorded the greatest constitutional protection against State interference, is composed of three basic elements: first, the biological relationship between parent and child (*Smith*, 431 U.S. at 843, 53 L. Ed. 2d at 34, 97 S. Ct. at 2109, citing *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558-59, 92 S. Ct. 1208, 1212-13); second, the marriage relationship (*Smith*, 431 U.S. at 843-44, 53 L. Ed. 2d at 35, 97 S. Ct. at 2109, citing *Griswold v. Connecticut* (1965), 381 U.S. 479, 486, 14 L. Ed. 2d 510, 516, 85 S. Ct. 1678, 1682); and third, the emotional and psychological attachment

involved in the daily activities of raising a child (*Smith*, 431 U.S. at 844, 53 L. Ed. 2d at 35, 97 S. Ct. at 2109, citing *Yoder v. Wisconsin* (1972), 406 U.S. 205, 231-33, 32 L. Ed. 2d 15, 34-35, 92 S. Ct. 1526, 1541-42).

Neither the Does nor Kirchner fits the *Smith* Court's definition of a "natural family." The Does clearly have a marital relationship and the emotional and psychological attachment to Richard. Yet, the Does lack a biological connection with Richard and, after the vacation of the adoption, the Does' only legal relationship with Richard is custodial. However, Kirchner is further removed from the *Smith* "natural family" definition than the Does. Kirchner has only a biological connection with Richard and lacks any emotional or psychological ties. Kirchner was not present at the time of Richard's birth. While Kirchner and Daniella are currently married, they were not married when the baby was born. Further, Daniella voluntarily terminated her parental rights four days after Richard's birth. In the eyes of the law, Daniella's interests are irrelevant. By voluntarily executing the irrevocable termination of her parental rights, Daniella effectively gave up Richard for adoption when he was only four days old. The State of Illinois then had the duty to ensure proper care for the four-day-old baby. The State fulfilled its duty by making Richard a ward of the court and granting temporary legal custody to suitable caretakers such as the Does. The Does' relationship with Richard more closely meets the United States Supreme Court's definition of a natural family than Kirchner's strictly biological relationship.

By giving the constitutional protections afforded to a "natural" or "unitary" family to Kirchner, the majority has clouded the central question: Do the custody interests identified in the Marriage Act and the Adoption Act to prevent the summary, arbitrary or wrongful

termination of Richard's emotional and psychological ties to the Does unconstitutionally impinge on the rights of Kirchner, the unwed, noncustodial, biological father who lacks any emotional or psychological ties to his offspring? A study of the five cases in which the United States Supreme Court has addressed the constitutional rights of unwed biological fathers indicates that Kirchner's rights as a biological father are not impinged upon by the allowance of the custody hearings sanctioned in the Marriage Act and the Adoption Act. *Michael H. v. Gerald D.* (1989), 491 U.S. 110, 105 L. Ed. 2d 91, 109 S. Ct. 2333; *Lehr v. Robertson* (1983), 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985; *Caban v. Mohammed* (1979), 441 U.S. 380, 60 L. Ed. 2d 297, 99 S. Ct. 1760; *Quilloin v. Walcott* (1978), 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549; *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208.

Contrary to the majority's assertion, *Michael H., Lehr, Caban, Quilloin,* and *Stanley* do not stand for the proposition that under our Constitution custody of a child may never be granted to a third party absent a finding that the biological parent is unfit. The Supreme Court in *Lehr v. Robertson* best summarized the constitutional rights of unwed biological fathers in relationships with their children. After a detailed examination of *Caban, Quilloin* and *Stanley*, the Court ruled:

" '*Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.*' [*Caban*, 441 U.S. at 397, 60 L. Ed. 2d at 310, 99 S. Ct. at 1770 (Stewart, J., dissenting).]

* * *

The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make

uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie." (Emphasis in original.) (*Lehr*, 463 U.S. at 260, 262, 77 L. Ed. 2d at 626, 627, 103 S. Ct. at 2992, 2993-94.)

The *Lehr* Court also emphasized that an unwed father's most effective means to protect his parental rights with his children is to marry the mother of the children. *Lehr*, 463 U.S. at 263, 77 L. Ed. 2d at 627, 103 S. Ct. at 2994; see also *Michael H.*, 491 U.S. 110, 105 L. Ed. 2d 91, 109 S. Ct. 2333.

Unlike the issues before this court at this time, *Caban, Quilloin, Lehr,* and *Michael H.* involved the complete and irrevocable termination of parental rights of an unwed father and not a custody determination. *Caban, Quilloin,* and *Lehr* all involved the complete termination of parental rights of an unwed, biological father when the mother had married, and the mother's husband was attempting to adopt the child. The Court found in *Michael H.* that a statute which severely limited the rights of an unwed, biological father to challenge the legitimacy of a child born into an existing marriage was constitutional. (*Michael H.*, 491 U.S. 110, 105 L. Ed. 2d 91, 109 S. Ct. 2333.) Only *Stanley* involved a custody determination. An unwed father's right to a hearing in a custody determination is the extent of Kirchner's due process rights under *Stanley*. (*Stanley*, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208.) Both the Marriage Act and the Adoption Act grant Kirchner the right to seek custody of Richard in a best-interests custody hearing.

The majority asserts that the rationale underlying these five Supreme Court opinions entitles Kirchner to the highest degree of constitutional protection available to an unwed, biological father because of the alleged deceit in the termination of Kirchner's parental rights.

(164 Ill. 2d at 486-87, 488.) This assertion is unfounded. The majority fails to understand that the Supreme Court, in these opinions, has afforded a biological father a high degree of due process protection to prevent improper *termination of his parental rights.* (See *Caban,* 441 U.S. 380, 60 L. Ed. 2d 297, 99 S. Ct. 1760; *Santosky v. Kramer* (1982), 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388.) These opinions do not afford the same protection to a biological father in a *custody proceeding.* Kirchner's parental rights were afforded complete protection under due process pursuant to *In re Petition of Doe* (1994), 159 Ill. 2d 347, which reinstated Kirchner's improperly terminated parental rights. On the issue of Kirchner's improperly terminated rights, his due process rights have been vindicated. *However, neither the United States Constitution nor Illinois law automatically vests custody in a noncustodial, biological father following the recognition of his parental rights. In sum, although Kirchner's right to develop a psychological father-son relationship was vindicated in the prior appeal, the State does not unconstitutionally impinge on that right by limiting or overseeing the way in which this relationship will develop under the circumstances of this case. That is the purpose of a custody determination. Custody will only be granted after a hearing on the child's best interests.*

## CONCLUSION

In defiance of established Illinois law and the constitutional rights of a small child under this law, the majority has given Kirchner the power to summarily terminate the only family relationship that Richard has ever known. By its denial of the rights established in the Federal and State Constitutions, and Illinois statutory and case law, the majority has denied Richard and the Does a custody hearing at which the best interests of the child would be considered. Instead, by the insupportable issuance of the writ forthwith, the court has

permitted a biological father who has never seen the four-year-old child the unqualified right to remove the child from his home and family, without any court determination or oversight of the best interests of the child. I cannot countenance such a result, or concur in a decision which recognizes only the rights of the biological parent and which totally ignores the rights of the child and the Does, who cared for him since he was four days old.

In denying Richard the protections the State has provided him, the majority places more importance on biology than on the importance of the nurturing, caring, and loving involved in raising a child. Illinois has always made the welfare of children the concern paramount to all other concerns in custody disputes. The majority calls this policy a "remnant of a bygone era." (164 Ill. 2d at 482.) Because I believe this policy, deeply rooted in Illinois law, has progressed, and should progress, with the development of the law rather than be eradicated with the passage of time, I cannot concur in the majority's regressive holding.

Hopefully, some day children will be given their due process rights under the law, and will also be endowed with the same guarantees of their rights as are all other citizens. In its wisdom, this court should have examined its thinking, not only in the light of statutes and precedent, but also in the light of reality and human consequences. In both lights this court has failed Baby Richard. Accordingly, I dissent.